UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

STAN LABER,

                         Plaintiff,

vs.                                              Case No. 18-1351-JWB-GEB

                                                 Jury Trial

LLOYD J. AUSTIN, III, SECRETARY,
UNITED STATES DEPARTMENT OF
DEFENSE,

                         Defendant,


## PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FOR CHARGE 02 AND OTHER DISCRETE ISSUES

Motion
Plaintiff requests the court to grant him partial summary judgment for Charge 02 and other Discrete items regarding all charges.

Background

        Plaintiff is Stan Laber, a Jewish male born in 1945.  He alleges discrimination on

the bases of age, religion, sex, and reprisal in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, et seq as amended and because of his age in violation of

the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq as amended when

he was not selected for a GS-1102-11, Contract Administrator vacancy at Milwaukee,

WI.  This is Charge 02 of the 21 non-selection charges comprising the instant

complaint.  The job opportunity announcement (JOA) for the vacancy was

SWH8149YEHA3385731204424. Plaintiff maintains that Defendant discriminated against

him on the bases stated above in retaliation for the instant complaint and his previous

complaints. Plaintiff presents both direct evidence and circumstantial evidence, meaning both a mixed motive claim and a pretext claim.  He also establishes herein a prima facie for discrimination based on age, sex, religion, retaliation, for each basis in the context of "failure to hire", under the laws and on a subset of the theories expounded in the pre-trial order.

This is one of those rare cases of direct evidence of discrimination. Further, it is likely the only case where a selecting official has voluntarily proffered a sworn admission of his retaliatory discrimination.  Further still, it is also unfortunately well-nigh the first ever reported case where all hiring officials misrepresented their actions and created an after-the-fact scenario to cover-up the discrimination.  The ill-conceived and botched cover-up was itself additional incontrovertible direct evidence of retaliation. This has persisted for over seven years because of Defendant's intransigence.

FACTS

1. Plaintiff first worked for Defendant as a file clerk in 1981 at its "DCMA" (Defense Contract Management Agency, Source: EXHIBIT T, ECF 215 PTO, Page 2.

2. DCMA is a DOD (Department of Defense) Combat Support Agency (CSA) with offices in various US cities and overseas locations, Source: EXHIBIT A, ROI Page 162.

3. DCMA administers DoD contracts for supplies and services, after they are awarded to local businesses, Source: EXHIBIT A, ROI Page 162.

4. DCMA provides local oversight for all DoD buying activities who first awarded the contracts. The end users are all US military, civilian, contractor forces and DoD partners, Source: EXHIBIT A, ROI, Page 162.

5. Plaintiff was most recently employed as a Contract Specialist at a different Combat Support Agency (CSA) DoD (Department of Defense)) in Virginia, the National Geospatial Intelligence Agency (NGA), Source: EXHIBIT A, ROI, Page 62.

6. Plaintiff was employed by Defendant continuously from 2006 until he voluntarily retired in early 2015.  EXHIBIT A, ROI, Page 62.

7. After not being promoted at NGA in 2013 and 2014, and desiring to work closer to family members, he sought reassignment for vacancies outside of Virginia.  Source: EXHIBIT Y Affidavit, Line 14.

8. Anxious to meet his goals, he primarily applied for vacancies in which he had previously served, regardless of grade or pay.  Exhibit Y, Affidavit, Line 18.

9. On December 09, 2014, Plaintiff requested DCMA EEO (Equal Employment Opportunity) informal counseling alleging that he was a victim of illegal discrimination when he was not selected for this vacancy, Source: EXHIBIT J, FAD, Page 4.

10. On February 15, 2015, Plaintiff filed his formal complaint alleging that Defendant discriminated against him on the bases of his age, sex, religion, and reprisal for prior protected activity under Title VII of the Civil Rights Act of 1964 and, because of his age and reprisal for his prior complaint activity, under the Age Discrimination in Employment Act of 1967 (ADEA) in December 2014 and earlier, Source: EXHIBIT J, FAD, Page 4.

11. Defendant investigated the complaint from June 15 – September 11, 2015, Source: EXHIBIT J, FAD, Page 4.

12. On November 30, 2015, Defendant issued a Final Agency Decision (FAD).  EXHIBIT J, FAD, Page 1.

13. The FAD stated ..."this decision does not include a prima facie case analysis on the

14. disparate treatment claims at issue." EXHIBIT J, FAD, Page 6.

15. On June 19, 2018, the OFO found that Plaintiff was the victim of retaliatory

discrimination and required public notice in the workplace that retaliatory discrimination

occurred in regard to Charge 02 but provided Plaintiff with no remedy or costs.   After

failed appeals, the instant civil action arose on nearly identical charges decided by the

OFO.  Source: Exhibit Y, Affidavit, Line 19.

16. This motion seeks summary judgment for liability for the same Charge 02 and

certain rulings regarding damages that would apply to all claims.  Source: Exhibit Y,

Affidavit, Line 20.

17. On September 18, 2014, Plaintiff submitted his application for this GS-1102-11 full

time, permanent Contract Administrator vacancy in Milwaukee, WI. Source: EXHIBIT T,

PTO, Item 9, Page 3.

18. The announcement stated that relocation (PCS) and other incentives may be

provided. Source: EXHIBIT A, ROI, Page 362.

19. The SRD stated that relocation and retention were equally possible, Source:

EXHIBIT A, ROI, Page 362.

20. Minerva Coffey, the HR Specialist reviewing Plaintiff's application, referred Plaintiff

to the DCMA Selecting Official for this vacancy, by including Plaintiff's name on the

Certificate of Eligibles. Source PTO, Item 11. Page 000339.

21. A certificate of Eligibles Certificate Number: MF-15-MLC-11819S0 Agency Request

Number (RPA): 204250 was issued on October 31, 2014 with 26 candidates to a cutoff

of 95. Source: EXHIBIT A, ROI, Pages 000344 to 000348.

22. Certificate of Eligibles Certificate Number: MF-15-MLC-11819S0 was returned on November 14, 2014 signed by Mr. Bennett with codes showing "NS" for all 26 candidates.  No selection was made, Source: EXHIBIT A, ROI, Pages 000344 to 000348.

23. A certificate of Eligibles Certificate Number: MF-15-MLC-11819S1 Agency Request Number (RPA): 204250 was issued on December 11, 2015 with 19 candidates to a cutoff of 80 EXHIBIT A, ROI, Pages 000339 to 000343.

24. Certificate Number:MF-I5-MLC-11819S1 was returned on January 13, 2014 signed by Mr. Bennett.  No selection was made, Source: EXHIBIT A, ROI, Pages 000339 to 000343.

25. Certificate Number: MF-I5-MLC-11819S1 was returned with SF30 codes (See EXHIBIT N, SF 39 codes") showing DP, DL, DG, and DL for 4 of the candidates who were the only candidates contacted, Source: EXHIBIT A, ROI, Pages 000339 to 000343.

26. Neither Mr. Bennett nor any official provided any evidence to substantiate the codes.

> The SF 39 instructs: "*Report appropriate action codes on the Certificate of Eligibles next to the appropriate name of the eligible. Declinations, Communication Returned Unclaimed, and Failed to Respond codes must be supported by documentation. Action codes for use in reporting are listed below:" See EXHIBIT N, SF 39 codes, Page 2.*

Mark Bennett served as the Selecting Official for this vacancy. Source: EXHIBIT T PTO, Item 12, Page 3.

27. Mark Bennett served as the Selecting Official for this vacancy. Source: EXHIBIT T PTO, Item 12, Page 3.

28. Lt. John Moffatt, Douglas Yee, and Ms. Aaren Hanson served as panel members for this vacancy, with Lt. Moffatt serving as the panel lead.  Source: Source: EXHIBIT PTO, Item 13, Page 3.

29. Plaintiff was selected to interview and interviewed for this vacancy via phone on November 5, 2014, at approximately 9 AM CST. Source: EXHIBIT T, PTO, Item 14, Page 3.

30. Interviews were conducted with applicants from the Certificate of Eligibles containing Plaintiff's name on November 5, 6, and 7, 2014, with the last applicant to interview, Mr. Foss, interviewing at approximately 8 AM CST Friday November 7, 2014. On December 30, 2014, Plaintiff identified this position, among others, in an email to DCMA's EEO office as a vacancy for which he believed he had been discriminated and/or retaliated against in the hiring process. Source: EXHIBIT T, PTO, Item16 Page 3.

31. Mr. Moffat had never previously served as a panel lead. Source: Source: EXHIBIT F, Deposition, 15, Line 1.

32. Mr. Moffat was not familiar with the merit promotion regulations in effect at the time he led the panel. Source: EXHIBIT F, Deposition, 15, Line 5.

33. Mr. Moffat does not recall panelist Ms. Hanson ever meeting with the panel in person. Source: EXHIBIT F, Deposition, 15, Line 6.

34. Mr. Moffat affirmed that Mr. Bennett provided the interview questions. Source: EXHIBIT F, Deposition, Deposition, Page 15, Line 16.

35. Mr. Moffat took notes at the interviews.     Source: EXHIBIT F, Deposition, Page 18, Line 11.

36. Mr. Moffat used his notes at the final evaluations and ratings. Source: Source: EXHIBIT F, Deposition, Deposition, Page 19, Line 10.

37. Mr. Moffat recalls that immediately following Plaintiff's interview, Mr. Yee spoke up about knowing Plaintiff personally and that Plaintiff had on-going legal activity with other agencies which Mr. Moffat referred to as "EEO activity". Source: Source: EXHIBIT F, Deposition, Page 28 Line 13-19.

38. Mr. Moffat shredded his notes when he left in March 2016 or passed them on to his replacement. Source: EXHIBIT F, Deposition, Page 18, Lines 20 to 25.

39. "Mr. Moffatt met with his team and had discussions before and after each interview and had discussion at a final ranking after the last interview where he accepted all the inputs from Mr. Yee and Ms. Hanson. "Source: EXHIBIT F, Deposition Page 21, Line 3 to 1.1

40. Mr. Moffat was not sure if the panelists discussed only the candidates' interviews or both the interviews and their resumes.   Source: EXHIBIT F, Deposition, Page 22, Line 11-15.

41. Mr. Moffatt took notes at the final meeting. Source: EXHIBIT F, Deposition, Page 22, Line 21.

42. Mr. Moffatt prepared the panel's recommendation some time after the meeting while he was at work.  He did not prepare his recommendation while at home. Source: Exhibit F, Deposition, Page 23, Line 1-7

43. Mr. Moffatt could not recall any details of what was said about any candidate at the final meeting. Source: EXHIBIT F, Deposition Page 23, Line 1-8.

44. Mr. Moffatt did not provide a copy of any recommendation to any panel member, only to Mr. Bennett. Source: EXHIBIT F, Deposition, Page 31, Line 1-2.

45. Mr. Moffatt could not "remember if EEO was brought up when Doug [Mr. Yee] was explaining that you had had legal activity going on regarding, you know, other agencies." Source: EXHIBIT F, Deposition, Page 30, Line 13-17.

46. Mr. Moffatt, was unable to recall anything about Plaintiff's application? Off the top of my head, I don't remember anything of it., not at this stage of the game, Source: EXHIBIT F,      Deposition, Page 29, Line 8-9.

47. Mr. Moffatt was asked

> "Q. Can you read your answer to the question: "When did  11 you learn of Mr. Laber's EEO activities?" It's the third one from the bottom of the page. Okay." His answer was "It was after we finished Mr. Laber's phone interview, we were discussing many other candidates. Doug was pulling things out of his memory, but I argued that we keep moving forward. We had so many people to interview, and if I stopped to worry about that previous EEO activity, it would have been a very lengthy process." Source: EXHIBIT F, Deposition, Page 29, Line 7-19.

48. Mr. Moffatt did not know if Ms. Hanson heard what he heard from Mr. Yee. When asked if he discussed EEO activity with anyone he did not answer but stated his lack of knowledge. The exchange was:

> "Q. In the next question that asks you: "Have you discussed Mr. Laber's EEO activity with anyone else? If so, what?" Can you read your answer there that begins "Major Aaren Hanson"?
> It says, "Major Aaren Hanson was telecommuting with us on the panel, and I'm not sure if she heard or was understanding what Doug was saying. Q. Can you explain that more? Pretty self-explanatory. If she was telecommuting, I don't know whether she had stepped away from her phone while we were talking or if she was there the whole time. I don't know." Source: EXHIBIT F, Deposition Page 30, Line 18-25 and Page 31, Line 1-4.

49. Mr. Moffatt attested that Mr. Bennett was responsible for all decisions. The Q&A

exchange was:

> Q. Can we go on to the next page? I think you've answered this, but I see it in
> the first question where it says: "Were you directed or persuaded to recommend
> a particular candidate or not to recommend a candidate? If so, please explain
> your response." Source: EXHIBIT F, Deposition Page 35, Line 21
> A. It was Mr. Bennett's call to say which ones we should interview. He's the
> supervisor and team lead and it was his decision to make. Source: EXHIBIT F,
> Deposition Page 36, Line 2.
> Q. Now, was this just in regard to selecting the people that were going to be
> interviewed?
> A. No.
> Q. Was this also in regard to the actual selection?
> A. Correct. Source: Exhibit F, Deposition, Page 36, Lines 2-9.

50. Mr. Moffatt attested that Mr. Bennett came up with the questions asked by the

panel. Source: EXHIBIT D, Declaration, 001721.

51. Mr. Moffatt attested that the panel made a determination of whom to recommend

for selection, Mr. Stevenson and Source: EXHIBIT D, Declaration, 001721.

52. Mr. Moffatt attested that the panel ranked Plaintiff as fourth of five interviewees,

Source: EXHIBIT D, Declaration, Page, 001721.

53. Mr. Moffatt attested that the panel did not select Plaintiff was: "Upon reviewing my

hiring recommendation provided to Mr. Bennett. The summary was the last sentence of

his paragraph entry - "While we felt he had the correct level of contracting knowledge,

it was overshadowed by the overall performance history." Exhibit F Deposition Page 36,

Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-P2P000018115

and at Exhibit D, ROI, 001730 to 001731.

54. Mr. Moffatt attested that Plaintiff was not selected because of Plaintiff's

performance and ability to work well with the team. Source: Exhibit D, ROI 001722

55. Mr. Moffatt attested that the sole reason Plaintiff was not selected because of Plaintiff's proximity to retirement and perceived intent to retire as stated in the panel's November 7, 2014 recommendation letter. Source: Exhibit F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.

56. Defendant does not maintain that Plaintiff's overall performance history or proximity to retirement were factors in Plaintiff's nonselection. Source: Source: Exhibit R ROG Answers, Items 12, 13, and 15.

57. Mr. Moffatt attested that Plaintiff interviewed very well in the Performance Letter and in the Age Letter, Source: EXHIBIT F Deposition Page 36, Line 4 to Line 12. Also see Exhibit F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.

58. Defendant attested that Plaintiff was not selected because of his poor interview performance. Source: Exhibit R, ROG Answers, Item 13.

59. Defendant does not maintain that Plaintiff's performance history or his proximity to retirement were factors in Plaintiff's nonselection. Source: Exhibit R ROG Answers, Items 12, 13, and 15.

60. Mr. Laber had some really good qualifications and I was looking forward to his interview, but sometimes when interviewing someone, the hair on the back of your neck goes up. I'll have to refer back to my notes to see what specifically stuck out. Source: EXHIBIT D, ROI, Page 001720.

61. Mr. Moffatt was asked about his declaration statement wherein Plaintiff's "overall performance history" was discussed.  The following Q&A resulted.

> Q. "Why did you or the panel not recommend Mr. Laber?"
> A. "Upon reviewing my hiring recommendations provided to Mr. Bennett, the

*summary is the last sentence of the paragraph entry, while we felt he had the correct level of contracting knowledge, it was overshadowed by the overall performance history. Not selected recommendation resulted."*
*Q. And again, where did that overall performance history come from?*
*A. I believe that came from Doug Yee's input. Q. Are you positive about that? A. I don't know where else we would have got that information. He had firsthand knowledge of your prior work in the office, so I'm almost 100 percent sure that that performance history was from Doug Yee, Source: EXHIBIT F, Deposition Page 37 Line 7-20.*

62. Mr. Moffatt attested that Plaintiff was overqualified because he was a DAWIA level

3. Source: EXHIBIT F, Deposition, Page 66, Lines 3-5 via the following testimony.

> *Q. Okay. So my question is, John: What do you think of these qualifications? Well, I think you're overqualified. The fact is, is that your experience level is well over what we were looking for. If you look at the job posting, it was for a Level 2, and you have three Level 3s. That's, by any stretch of the imagination, overqualified, Source: EXHIBIT F, Deposition, Page 70, Line 8-12.*

63. Mr. Moffatt attested he could provide a copy of the hiring recommendation to the

investigator but did not do so. Source: Exhibit D ROI 001723.

64. Mr. Moffatt had access to his interview notes as of 07/09/2015 and reviewed them

but did provide them to the investigator, Source: EXHIBIT D ROI 001720

65. Mr. Moffatt attested that he believed that Ms. Hansen did not understand what Mr.

Yee was saying apparently because she was telecommuting via phone. Source:

Declaration Exhibit D, ROI, Page 001719.

66. Okay. Well, if you don't mind, I'd like to discuss each one and see if you -- it might

prod your memory at all. In regard to Mr. Foss, you wrote that his style was very bland

and dry, but you have no memory of that; is that correct? A. That is correct. Source:

EXHIBIT F, Deposition, Page 45 Line 3-8.

67. Mr. Moffatt was asked if a candidate's age was related to being a long term fill. This

Q&A followed:

> Q. *Do you know of any evidence that would suggest that I would not be a long-term fill?*
> A. *I don't know if -- if anything that we've seen said that or didn't say that. At this point, it would be all speculation. Source: EXHIBIT F, Deposition, Page 57 Line 22-25.*

68. Mr. Moffatt was asked about age being a factor via this Q&A:

> Q. Well, if Mr. Yee or Ms. Hanson believed that Mr. Foss or I should not be hired because we were older, do you think you would recall that?
> A. *I probably would be able to recall something like that, because it would stick out in my head that we were talking about something that was not part of our selection criteria. Neither one of your ages were a factor in hiring you or not, and anything beyond that, it would be speculation because I vividly do not remember a conversation like that ever happening, period. Source: EXHIBIT F, Deposition, Page 58 Line 24 to page 59 Line 9.*

69. Defendant was responsible for the following recommendation being placed in the

ROI and an unknown. It partially stated:

> "Stan Laber (Not Selected): Mr. Laber interviewed very well but we felt he was not in the top three interviewed.  Mr. Laber currently works at National Geospatial-Intelligence Agency in Sprinfield, [sic] VA. as a Contract Specialist. He has been with DCMA in previous years as an IS as one panel member remembers his employment at the agency with his performance to be questionable. He currently has a DAWAI [sic] Level III certification and possesses knowledge of Government contracting, although it is also questionable as to his ability to work within a team environment in a government setting: also found in the Milwaukee office. While we felt he had the correct level of contracting knowledge it was overshadowed by the overall performance history." See Exhibit F Deposition Page 36, Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-P2P000018115 and at Exhibit D ROI 001730 to 001731.

70. The above version is the version included in the ROI and the ROI was never

revised. It is also the version upon which the 30(b)(6) witness testified as being the

sole record of the panel's proceedings and the sole version that Mr. Bennett relied upon

when he rejected Plaintiff. Source: Exhibit D, ROI, 001730 to 001731.

71. Other than the investigator, there is no indication in the record that any individual

had permission to upload documents to the ROI database except for Mr. Harris, the EEO officer.

72. Mr. Moffatt attested that he was influenced by Mr. Yee when he wrote the recommendation letter.  He stated concerning the "Performance Letter" in the ROI version:

> "- *it was edited because, in my opinion, I took too much information from what Doug Yee was telling me and put it into record where I cleaned it up and provided the final draft, which was -- which read: "While we felt he had the correct level of contracting knowledge, it was overshadowed by the overall performance history."*
>
> *Exhibit F, Deposition Page 78, Lines 2-7.*

73. At other places in his deposition, Mr. Moffatt stated he did not know which version was the draft or which version was the final version or who authored or edited either version.

> *Q: So I'm just asking you: Are you sure that Mr. Bennett didn't take your file and submit it as yours, submit it to himself as yours?*
> *A. I don't know whether that is a factual statement or not. I can't -- I don't have proof one way or the other, and I honestly don't remember making these changes, if I did, but -- and again, I don't know which one is the final draft and which one is the rough draft .and I honestly don't remember making these changes, if I did, but -- and again, I don't know which one is the final draft and which one is the rough draft. Exhibit F, Deposition Page 81 Lines 98 - 106.*

74. Mr. Moffatt is unable to provide any basis for the content for either version or which letter came first or last or who may have edited either letter. Source: EXHIBIT F, Deposition Line 18-22.

75. Mr. Moffat testified:

> *Q. Well, are you sure that you wrote both?*

*A. I don't know. All I can do is speculate at this juncture, because I don't have vivid memory of writing -- writing these. But, obviously, looking at them, it looks like a first draft and a final draft.*

*Q. Well, the reason I ask is because it seems so inconsistent with your testimony about not considering age or anything related to age. And here, it says that you thought I was going to retire.*

*A. Like I said, I don't remember --*

*MR. SHAW: Objection to form.*

*A. -- writing that. I don't remember writing that, but again, if I did write it, and again, it would just be speculation. That information would have had to come from Doug Yee because neither me or Major Hanson knew anything about you and retirement or not. So that would have had to come from Doug Yee and, obviously, he's not around to tell us whether he did it or not. But like I said, I don't have a strong memory of writing either one of these drafts. Obviously, one of them was a first draft and one's a final.*

*Q. Well, I'm wondering which one was first and why the one was changed to the second one, regardless of the order.*

*MR. SHAW: Objection as to form.*

*Q. Did anyone tell you to change anything?*

*A. Not that I'm aware of. I don't remember any kind of conversation like that.*

*Q. Do you think someone could just take the file and just type over the words and send it in?*

*A. It's all done electronically. I mean, nothing is wired sealed, so anything's possible. I don't understand why it would be changed or what it was changed from and to, but -- and again, I don't have A strong recollection of even putting that together, but, obviously, I did with my name on it. Source: EXHIIT F, Depostion, Page 79, Line 19 to Page 81, Line 8.*

76. On Jul 10, 2014, the investigator asked:

Thank you for sending your testimony so quickly. I noticed that on the bottom of page 4, you mention the hair on the back of your neck went up during Mr. Laber's interview-- were you able to find your notes from the interview to remind you what caused that? If you have the notes, please also forward a copy to me for inclusion in the investigative file. Source: EXHIBIT D, ROI 001732.

Also, at the bottom of page 5, you say Mr. Laber was not recommended because of his

"overall performance history." What history, specifically, are you referring to?

77. In response to questions from the investigator, Mr. Moffatt replied on 08/03/2015:

Page 4 regarding my comment on the hair on my neck, I don't have notes to

that affect as it was just a feeling that due to his pitch and tone of his response that his answers were concerning, but not wrong as to there [sic] content. EXHIBIT D, ROI 001732.

Page 5 regarding his "overall performance history" that was contributed to the statement from one of his previous coworkers Doug Yee while working with Mr. Laber in our office. The resume appeared to be solid regarding the performance, which made me concerned that there might have been other issues not presented regarding his performance, Source: EXHIBIT D, ROI 001732.

78. Mr. Moffatt attested that he didn't recall discussing Mr. Yee or Plaintiff's legal issues with Mr. Bennett or anyone else. EXHIBIT F Deposition Page 24, Lines 7-14. Page 25, Lines 3-4,

79. Moffatt is unable to recall writing either the letter or any basis for any content or when he wrote it. EXHIBIT F Deposition Page 45, Lines 23-24.

80. Mr. Moffatt recalls writing the recommendation letter while at work and not at home.

> Q. Okay. So you and Mr. Bennett didn't secretly communicate across your personal e-mails; is that right?
> A. No, that wasn't standard protocol, what we did. I just sent that format to my home computer so I could work on the format, so then the following day I could fill in the information at work. That's what I can recall. You know, it was -- it's been a long time, but I wouldn't have worked on it like that at home, Source: EXHIBIT F Deposition Page 63, Lines 1-10.

81. The interview notes were shredded except for Ms. Hanson's notes. Shredded. Source: EXHIBIT F Deposition Page 18. Line 16 and Page 1t. Line 20.

82. DCMA, DoD, OPM, NARA and EEOC regulations have authored guidelines on preserving interview notes.

83. There is no evidence that Mr. Moffatt or the other panelists scored or ranked how well the candidates performed in the interviews or the qualification stated on their applications.

84. There is no evidence that a consensus meeting after the Mr. Foss interview was held or at any time.

85. Mr. Moffatt attested that he currently suffers from a condition that limits his memory. Source: Exhibit F Deposition, Page 81, Lines 7-8.

86. Mr. Moffatt was unfamiliar with DCMA merit promotion regulations at the time of the disputed non-selection. Source: Exhibit F Deposition, Page 15, Line 2.

> Q. When you were the lead, were you familiar with the DCMA merit promotion regulations that were in effect at the time?
> A. At the time, no, I wasn't aware of that because I was in the military, so those policies didn't affect the military directly, Source: EXHIBIT F, Page 11, Lines 2-7.

87. Mr. Moffatt attested in his ROI declaration that he believed Ms. Hanson may not have heard or understood what Mr. Yee saying regarding Plaintiff. When he was asked why he believed that, he had no reason for that belief, Source: EXHIBIT F, Deposition, Page 29 Lines 18-25.

Hanson

88. Ms. Hanson testified that she never spoke or met with Mr. Bennet regarding any applicant at any time. EXHIBIT H, Deposition, Page 25 Lines 2-3.

89. Ms. Hanson had never seen any recommendation letter until the date of her deposition. EXHIBIT H, Deposition, Page 33. Line 24.

90. Ms. Hanson stated that proximity to retirement was not discussed. 44 9-13

91. Ms. Hanson stated that Plaintiff's past performance was not a basis for his non-selection because it had never been discussed or considered. EXHIBIT H, Deposition, Page 45, Line 25.

92. Ms. Hanson stated that Plaintiff's proximity to retirement was never considered or

discussed. EXHIBIT H, Deposition, Page 43, Line 10.

93. Ms. Hanson wrote in an email to the investigator that

> *"In reference to your second question, I don't remember anything specific being said regarding Mr. Laber's prior litigation with the Army in Germany being discussed prior to, during or immediately following his interview nor during discussions regarding our hiring recommendations to Mr. Bennett. At no time did Mr. Laber's prior litigation impact my decision to not recommend Mr. Laber as the top candidate for employment with our organization.  I do recall one of the other members of the panel (Doug Ye[sic]) stating that he spoke to another employee who may have remembered Mr. Laber from his prior employment with the Agency. Mr. Laber was the only candidate we interviewed that had previously worked with DCMA in the Chicago/ Milwaukee area. What was relayed is that if you wanted to learn more about Mr. Laber "google" him. I didn't "google" Mr. Laber at any time during the job interview process."*

94. Ms. Hanson determined that Plaintiff was one of her top three recommendations.

EXHIBIT H, Deposition, Page

95. On March 1, 2015, Beverly Lynch notified Plaintiff that "You were referred and notification letters were issued on 11/03/14. At this time management has selected another applicant, disposition letters will be issued." Source: EXHIBIT A, ROI Page 357.

96. Records sufficient to reconstruct the merit promotion action, including documentation on how candidates were rated and ranked will be maintained for two years or after the program has been formally evaluated by OPM (whichever comes first) if the time limit for grievance has lapsed before the anniversary date. 14.1

14.2. In cases involving discrimination complaints, the records must be retained for four years after final administrative action on the case. The Army AST designates a specific point of contact for the retention of records pertaining to discrimination cases.000334

9.2.2. The panel will assess the relative strengths of candidates' qualifications for the specific position being filled, using the template in paragraphs 9.2.2.1.1. through

9.2.2.1.6., below, as a guideline. The majority recommendations of the panel will be recorded in writing, and will document an evaluation of each of the factors identified in the template, i.e., experience, education (including self-development) and training related to the job being filled, and pertinent outside activities (refer to paragraphs 9.2.2.1.1. through 9.2.2.1.6., below).

97. The panel's written recommendations to the selecting official will be the sole official record of the panel's proceedings. ROI 002223".

Plaintiff's Evaluation:

98. Although inconsistent, both versions of the panel's recommendation stated that Plaintiff performed "very well" on his interview and "had the correct level of contracting knowledge".

From the complaint:

99. On January 15, 2015, Plaintiff wrote to the personnel office via "applicant inquiry":

100. "I applied for this vacancy and was referred and interviewed. Can you please tell [me] the current status?

101. On March 01, 2015, Plaintiff received a response from his "applicant inquiry notice" of January 15, 2915:

102. "I'm responding to your applicant inquiry for announcement SWH8149YEHA3385731204424. "You were referred and notification letters were issued on 11/03/14. At this time management has selected another applicant, disposition letters will be issued. I regret I can't provide more positive information at this time but encourage you to apply for future Defense Contract Management Agency vacancies."

103. On March 10, 2015, Plaintiff received a second notice that the "vacancy announcement has been cancelled; no selections were made".

104. On or about September 28, 2015, as a result of Plaintiff's formal complaint, Defendant issued a Report of Investigation (ROI).

105. On November 30, 2015, Defendant issued a Final Agency Decision (FAD) pursuant to 29 C.F.R. § 1614.110(b), without a hearing.

106. The FAD alleged that the selection panel decided which applicants to interview but did not recommend anyone and therefore the recruitment was canceled.

107. The ROI reported that on October 31, 2014, the personnel office issued a referral certificate MF-I5-MLC-11819S0 with 26 applicants, including Plaintiff, based on a cutoff score of 95. It was returned on January 13, 2015 without a selection.

108. On or about December 11,2014, another certificate, MF-15-MLC-11819S1, was issued with 19 applicants, excluding Plaintiff, based on a cutoff of 80 and expired 12/29/2014. It was returned on January 13, 2015 without a selection.

109. The selecting official, Mark Bennet, selected Plaintiff and others for panel interviews.

110. Plaintiff was rejected separately or collectively by panelists Douglas Yee, Aaren Hanson, and John Moffatt, who was the panel lead based on his age, sex, religion, and retaliation.

111. Plaintiff was the only applicant whose resume demonstrated prior employment with Defendant.

112. Plaintiff was the only applicant whose resume demonstrated experience awarding,

administering, negotiating, and closing out DoD cost type contracts.

113. No other applicant's resume revealed more than one DAWIA Certificate at Level 3.

114. Yee admitted that during the interview phase, he notified the panelists and the selecting official of Plaintiff's prior protected activity and advised them not to hire Plaintiff because of Plaintiff's probable need for a religious accommodation.

115. Plaintiff maintains that Bennett agreed with Yee that Plaintiff should not and would not be selected.

116. Plaintiff maintains that Bennett ordered Moffatt to prepare a summary recommendation to eliminate Plaintiff from consideration.

117. On November 15, 2014, the panel rejected Plaintiff and recommended Cornelius Stevens as the most highly recommended applicant and Sherri Jordan and Scott Homner as backups after Stevens.

118. No applicant except Plaintiff had government contracting experience with multiple DAWIA certifications and experience with DCMA as a contract specialist.

119. Moffatt's recommendation was not signed, or seen, or approved by Yee or Hanson.

120. Defendant alleged that Plaintiff was ranked fourth in the interview evaluation.

121. Cornelius Stevenson held no DAWIA certification when he was recommended for selection, was not qualified, and should not have been referred because of lack of one year of specialized experience at the GS-09 level.

122. Plaintiff maintains that he was the only applicant who met the minimum qualifications to be appointed or referred to the selecting official.

123. Defendant produced no record that Moffatt's written recommendation represented

the consensus of the panelists.

124. Plaintiff maintains that no consensus meeting ever took place on November 7, 2014 or at any time.

125. Defendant did not preserve the notes of the resume reviews or interviews and none appear in the record except for the interview notes of Hanson.

126. All panelists' notes were forwarded to Moffatt, but Defendant did not preserve any resume review notes or interview notes.

127. Hanson preserved a copy of her interview notes regarding Plaintiff's interview on November 5, 2014 and provided it to Defendant's investigator.

128. Hanson attested to the fact that she had no knowledge of Plaintiff's prior EEO activity:

129. "Q: How did you learn of Mr. Laber's EEO activities?", she replied "I don't remember learning about any of Mr. Laber's EEO activities until this [EEO Investigator's] interview."

130. On November 07, 2014, Moffatt reported that the panel allegedly chose Cornelius Stevens as their top candidate and allegedly forwarded their recommendation to Mr. Bennett.

131. Plaintiff's name appeared on every recommendation letter as "not selected", identical to that adopted by the selecting official on November 1, 2014.

132. Each selecting official, on unknown dates, searched Plaintiff's name on the internet and discovered Plaintiff's prior protected activities.

133. On unknown dates, Yee advised Bennet, Moffatt and Hanson of Plaintiff's prior

protected activities and that Plaintiff "had a history of litigation with the Army".

134. On July, 07, 2015, Yee provided the Defendant investigator his affidavit wherein he attested that he deliberately and knowingly caused Plaintiff to not be recommended by the panel because of Plaintiff's religion and prior protected activity.

135.

136. Yee partially described the procedure regarding note taking as:

137. "We take notes and put everything in a folder and hand them to the chief of the panel. I do these a lot for Defendant." EXHIBI D, ROI, Page 001751.

138. Yee also attested that:

139. "there were no rating sheets used to rank candidates for this position but we used the interview forms with the 8 questions. For each candidate, we fill out the questionnaire sheet and make notes. At the end, we might write a number at the top of the sheet to rank the candidates". ROI 001750.

140. "RPA Tracker" is a database used by AST  to record all events related to each recruitment. It is an online system called "RPA Tracker" at the web address described at the bottom of the page, Source: EXHIBIT E, Page 02191in the ROI.

141. Defendant destroyed or failed to preserve Yee's, Moffatt's, Bennett's and portions of Hanson's original notes regrding the resume review.

142. Religion played a separate and "but for" role in the nonselection.

143. Bennett and other selecting officials became aware of Plaintiff's prior protected activity before the panel made its recommendation to Bennett.

144. Ms. Hansen scanned her notes and emailed them to Moffatt.

145. Mr. Bennett, Ms. Hanson, and Mr. Moffatt each searched Plaintiff's name on the internet prior.

146. Defendant did not reprimand Yee for his actions during the recruitment or after.

147. Plaintiff alleges that Bennet retaliated against Plaintiff by rejecting him as well as all applicants and canceling the recruitment.

148. Plaintiff alleges that Bennett, with the advice of other unknown officials, canceled the recruitment.

149. Plaintiff alleges that Bennett determined that it would be best to cancel the recruitment in order to limit liability for Defendant and prevent Plaintiff from ever being employed as a second punishment for him and a protection for Defendant.

150. Plaintiff alleges that Bennett improperly guided Moffatt and Hanson in the preparation of their affidavits for the investigation.

151. Bennett orchestrated all Defendant responses to the complaint.

152. The affidavit of Hanson contained a near "word for word" repetition of the words used by Bennet in his affidavit.

153. On July 10, Hanson wrote to the investigator:

154. "In reference to your second question, I don't remember anything specific being said regarding Mr. Plaintiff's prior litigation with the Army in Germany being discussed prior to, during or immediately following his interview nor during discussions regarding our hiring recommendations to Mr. Bennett. At no time did Mr. Plaintiff's prior litigation impact my decision to not recommend Mr. Plaintiff as the top candidate for employment with our organization."

155. On July 09, 2015, Bennett wrote to the investigator:

156. "No, I don't recall any information of litigation in Germany. This had no effect on any decisions I made in the hiring process. Thanks, Mark" Exhibit D ROI 001714.

157. Plaintiff alleges that a review of all of the interviewers' notes would have demonstrated that the Plaintiff's qualifications were so superior that no jury would believe that a reasonable employee would not choose Plaintiff over any other applicant.

158. Mr. Moffatt destroyed his notes which would have revealed how Bennett controlled every aspect of the recruitment and the panel's activities with intent to retaliate against Plaintiff.

159. The communications between and among the selecting officials, the EEO officials, and agency legal personnel throughout the recruitment, the investigation, and administrative appeals demonstrate unreasonable animosity leveled at Plaintiff and evidence of bad faith to quash his complaint.

160. Bennett did not provide a specific, clear, and individualized explanation for rejecting Plaintiff such that Plaintiff had an opportunity to prove that the explanation was a pretext for discriminatory animus.

161. Plaintiff was not provided a specific, clear, individualized, and non-discriminatory explanation, so that Plaintiff had an opportunity to prove that the explanation was a pretext for discriminatory animus.

162. No other referral certificates other applicants were referred by the personnel office for this vacancy.

163. There is no evidence that the second referral certificate was ever used to contact

any applicant for any reason.

164. No selecting official contacted references for applicants from any certificate or other referral.

165. Defendant has not revealed the identity or application of a selectee for this vacancy so Plaintiff is not able to state how his [Plaintiff's] qualifications exceeded those of the selectee.

166. On July 08,2015, the Defendant investigator asked Bennett:

167. "One point of clarification: Mr. Yee stated he informed you of Mr. Plaintiff having been involved in litigation with the Army in Germany. Do you have any recollection of his informing you of this? If so, what do you recall him telling you and what effect, if any, did it have on your decision not to select Mr. Plaintiff? "

168. On July 09, 2015, Bennett replied:

169. "No, I don't recall any information of litigation in Germany. This had no effect on any decisions I made in the hiring process. Thanks, Mark" Exhibit D ROI 001714.

170. Moffatt attested that he was the only panel member who reviewed all resumes:

171. "As the lead panel member, I reviewed all of their resumes, the other panelists only saw about 6 of them. Mr. Plaintiff had some really good qualifications and I was looking forward to his interview, but sometimes when interviewing someone, the hair on the back of your neck goes up. I'll have to refer back to my notes to see what specifically stuck out."

172. When the investigator asked Moffat him in a later email about "the hair on the back of his neck, Mofftt replied:

173. "..regarding my comment on the hair on my neck, I don't have notes to that affect as it was just a feeling that due to his pitch and tone of his response that his answers were concerning, but not wrong as to there [sic] content."

174. Defendant destroyed all original notes, thus ensuring that no information favoring Plaintiff would come to light.

175. Moffatt did not preserve his or any panel member's notes.

176. If Plaintiff would have been offered the position, he would have accepted it with his pay set at the HPR (Highest Previous Rate), GS-1102-11, step 10, moved to Milwaukee with government provided PCS, and without a break in service.

177. Plaintiff would have request PCS (relocation and retained pay. He would not have retired in the way he did which caused him to incur a "break in service" as defined by OPM. He would have simply transferred from one position with Defendant to another with Defendant. He would have then been promoted though the next 17 years of service.

178. If Plaintiff had incurred or is deemed have incurred one or two days of no employment (Nov 10, 11, 1014) that gap did not make his receipt of the payout of unused annual leave improper, nor did it make him unqualified for any vacancy under dispute herein.

179. But for the discrimination by Mr. Yee that influenced others, Plaintiff would have been recommended and selected, especially given that no other applicant was as well qualified or even interested in the position.

180. Defendant's bases for non-selection, his allegedly poor interview performance and

lack of knowledge compared to other applicants, were pretextual, not truly believed, false, contradicted by the record, not conducted as required by agency regulations, and evidence of pretext and animus. The constantly shifting reasons contrived by Defendant, the biased administrative investigation, conducted without regard to its own regulations, together serve as evidence of illegal retaliatory discrimination based on age, sex, religion, and retaliation for exercising his rights. Rarely in discrimination cases is such direct evidence plainly revealed in the form of sworn statements of the perpetrators themselves.

181.

182. Plaintiff's age, gender, religion, and prior protected activity were the "but for" reasons in this failure to hire action.

183.

184. All events related to each recruitment are tracked and shared in an online system called "RPA Tracker" at the web address described at the bottom of the page. Source: Exhibit E, ROI, Page 02191.

185. The Agency Merit Promotion Program states explains that the notation "ND" in a paragraph indicates the entire paragraph is mandatory and not appropriate for deviation by local authorities.:

186. DCMA mandatory requirements that are not appropriate for CMO Commander/Center Director deviation approval authority are preceded by the Letters "ND" - See Deviations - FAR, DFARS, DoD Directive, Other Regulatory/Government Documents and DCMA Instructions. Source: Exhibit M Page 1.

187.

188. The Agency Merit Promotion Program states:

189. "All staffing actions, including qualification, evaluation, and selection of candidates, shall be made without regard to political, religious, or labor organization affiliation or nonaffiliation, marital status, race, color, sex, national origin, non-disqualifying disability, or age, and shall be based solely on job-related criteria." Source: Exhibit M Page 1.

190. The Merit Promotion Program states:

191. (ND) When a promotion certificate contains at least three qualified competitive candidates the selecting official may not reject the certificate as inadequate solely on the basis that it contains an insufficient number of eligibles, Source: EXHIBIT M, Merit Promotion Program, Paragraph 8.

192. The Merit Promotion Program states:

> *Any employee who has authority to take, direct others to take, recommend, or approve any personnel action shall not appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement any relative as defined in 5 CFR Part 310-102. No employee shall engage in, or direct others to engage in any prohibited personnel practices, Source: EXHIBIT M, Merit Promotion Program, Paragraph 8.4.*

193. The Merit Promotion Program states:

> *14. Records Maintenance and Disclosure*
> *14.1. Records sufficient to reconstruct the merit promotion action, including documentation on how candidates were rated and ranked will be maintained for two years or after the program has been formally evaluated by OPM (whichever comes first) if the time limit for grievance has lapsed before the anniversary date, Source: EXHIBIT M, Merit Promotion Program, Paragraph 14.*
>
> *In regard to the use of panels for GS-14 and below, The Merit Promotion Program states:*
> *9. Panels. (Refer to Appendix A.)*

*9.1. Establishment and Composition.*

*9.1.1. For GS-14 and below positions.*

*9.1.1.1. The selecting official may decide to convene a panel when competitive candidates are referred. (ND) A panel with at least three members that are civilians of the same or higher grade as the position being filled and/or military of equivalent rank, may be used to review and/or interview candidates, but they may not administer any type of test or formally score responses to questions to arrive at scores. The panel membership will be structured to appropriately address subject matter expertise (pertinent to the position being filled), diversity, leadership or leadership potential considerations. The selecting official may not serve as a panel member. The selecting official or his/her designee will coordinate the composition of the panel with the EEO office for diversity of the panel via email.*

*9.1.1.2. The panel may be convened to review and recommend candidates as long as the selecting supervisor remains responsible for making his/her own selection.*

*9.2. Roles and Procedures.*

*9.2.1. The role of the panel will be to collectively assess the candidates on the competitive referral list and recommend a maximum of five competitive candidates to the selecting official for final consideration. The panel may elect to interview*

*candidates on the competitive referral list, at its discretion. (ND) However, if any candidate on the competitive referral is interviewed, then all competitive candidates must be interviewed. At his/her discretion, the selecting official may participate as an observer during panel interviews.*

*9.2.2. The panel will assess the relative strengths of candidates' qualifications for the specific position being filled, using the template in paragraphs 9.2.2.1.1. through 9.2.2.1.6., below, as a guideline. The majority recommendations of the panel will be recorded in writing, and will document an evaluation of each of the factors identified in the template, Merit Promotion Program i.e., experience, education (including self-development) and training related to the job being filled, and pertinent outside activities (refer to paragraphs 9.2.2.1.1. through 9.2.2.1.6., below). (The panel's written recommendations to the selecting official will be the sole official record of the panel's proceedings.)*

*9.2.2.1. Resume Evaluation Criteria Template.*

*9.2.2.1.1. FUNCTIONAL EXPERIENCE - Experience in the occupation/discipline(s) of the position being filled, and experience in related occupations. Additional credit should be provided for experience in a variety of organizations/locations (e.g., more than one Contract Management Office, at a buying command and at a CMO, etc.). Additional credit is also appropriate for experience at both staff and operating levels.*

*9.2.2.1.2. SUPERVISORY EXPERIENCE (not used in filling non-supervisory positions) - Experience as a supervisor*

*(including periods while detailed or temporarily promoted). When the position*

*being filled is at the second supervisory level and above, additional credit would be warranted for prior experience in supervising a staff through subordinate supervisors.*

*9.2.2.1.3. EDUCATION - Education/coursework beyond the secondary level that is related to the position being filled, including undergraduate and graduate level coursework. Credit should be provided for pertinent education/self-development without regard to whether it led to a degree.*

*9.2.2.1.4. TRAINING - Work-related training and other formal courses not leading to degree programs, e.g., executive development/leadership programs.*

*9.2.2.1.5. AWARDS/RECOGNITION - This category includes performance awards, special act/service awards, formal honorary recognition (e.g., DCMA Exceptional Service Award), and other types of recognition for contributions.*

*9.2.2.1.6. PERTINENT OUTSIDE ACTIVITIES - Participation/leadership in professional/occupational associations, societies, etc., that are related to the functional coverage of the position being filled.*

*9.2.2.2. Noncompetitive Candidates. Consideration of noncompetitive candidates is not covered by merit promotion procedures. The selecting official may ask a panel to make recommendations regarding the noncompetitive candidates referred, but the panel is not required to evaluate them formally. Source Exhibit M. Paragraph 9.*

*In regard to records retention, the Merit Promotion Program States:*

*14.2. In cases involving discrimination complaints, the records must be retained for four years after final administrative action on the case. The Army AST designates a specific point of contact for the retention of records pertaining to discrimination cases. Source: Exhibit M. Paragraph 14.2.*

<u>LEGAL STANDARDS</u>

Plaintiff asserts that he is entitled to recover damages upon the following theories: Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq. and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq.

Defendant rejected (failed to hire) Plaintiff in violation of Title VII and ADEA, specifically, by discriminating against him because of retaliation for his prior protected activity, his anticipated protected activity, and his actual protected activity in pursuing

the instant complaint for Charges 2 in the amended complaint and without waiver in regard to other charges.

Defendant rejected (failed to hire) Plaintiff in violation of Title VII, specifically, by discriminating against him because of his religion for Charge 2 in the amended complaint and without waiver in regard to other charges.

Defendant rejected (failed to hire) Plaintiff in violation of Title VII, specifically, by discriminating against him because of his gender (male) in those instances where females were treated more favorably for multiple charges but this basis not argued at this time in this motion and without waiver in regard to other charges.

Plaintiff relies on the theory of Retaliation for Title VII and ADEA for every charge but Charge 2 is discussed herein without waiver in regard to other charges.

Plaintiff relies on the theories of Disparate Treatment and Disparate Impact based on Title VII and ADEA for charge 2 without waiver in regard to other charges. For all charges, Defendant has failed to meet its burden of production in Charge 2 because it has not provided a legitimate, non-discriminatory, specific, clear, and individualized explanation for rejecting Plaintiff such that Plaintiff had an opportunity to prove that the proffered explanation was a pretext for discriminatory animus or retaliation for any charge.

For all charges, Plaintiff's theory of liability is one or a combination of the following three scenarios. The first scenario is when the ultimate decision maker manipulated the panel (or certain panelists) to execute his/her own discriminatory and retaliatory motives and intent by advising the panel to reject Plaintiff when the panel (or certain

panelists) otherwise would not have done so and did not otherwise hold discriminatory and retaliatory motives or any improper intent. The second is the reverse, where the panel (or certain panelists) held the discriminatory and retaliatory motives and was influenced by the selecting official or ultimate official who otherwise held no discriminatory and retaliatory motives to reject Plaintiff. The third was when the both the panel (or certain panelists) and the selecting official or ultimate official both held discriminatory and retaliatory motives and acted in consort to reject Plaintiff. In this third scenario it was common for either the panel, the selecting official, or both to deny having any discriminatory or retaliatory motive or intent.

Plaintiff relies on both direct evidence and pretext theory for all charges. To any extent his claims for economic damages (i.e. back pay, front pay, costs, stated herein) might be limited, he reserves the right to rely on the theory or combination of theories that afford the greatest economic remedies or he may choose to favor non-economic remedies for other reasons, or a combination of theories. He reserves the right to choose different, separate, or both theories for each charge. Each charge may have different or multiple theories. The nature of the evidence Plaintiff presents to meet his various burdens is not intended to be determinative of a specific legal theory or basis for any specific type of remedy. Should new information arise, he reserves the right to modify the above. The use of the phrase "but for" for any charge herein is not meant to limit reliance on a particular theory or theories, nor does it dictate the highest or lowest bar within each that Plaintiff is required to make.

**FED. CIV. P. 56**

This Court has summarized the standards for summary judgment:

> Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.,* 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id.* The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir. 2004). *Holick v. Burkhart,* 388 F. Supp. 3d 1370, 1378–79 (D. Kan. 2019).

In regard to evidence, this court has stated:

> We will "consider only admissible evidence in reviewing an order granting summary judgment." *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir. 1995). "[T]he nonmoving party need not produce evidence 'in a form that would be admissible at trial,' but the content or substance of the evidence must be admissible." *Thomas v. International Business Machs.,* 48 F.3d 478, 485 (10th Cir. 1995) (quoting *Celotex Corp.,* 477 U.S. at 324).

Because Plaintiff was, and would have been, a federal employee, the lower burden described in Babb v Wilkie, Supreme Court, 18-882, April 6, 2020 applies, where "[P]ersonnel actions . . . shall be made free from any discrimination based on age . . . ." 29 U.S.C. § 633a(a). The Court explained that § 633a(a)'s terms required a plaintiff to show only that "age discrimination plays any part in the way a decision is made[.]" Id. at 1174 (emphasis added). based on age') demands that personnel actions be untainted by any consideration of age."

Because the relevant statutory provisions of the ADEA and Title VII are essentially identical, the Babb Court's interpretation of the ADEA's phrase "personnel actions . . . shall be made free from any discrimination based on" must control equally here. Justice Thomas observed in his dissent in Babb:

> "Because § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e–16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well." Babb, 140 S. Ct. at 1181 (Thomas, J., dissenting).

## **Argument**

As stated in the "BACKGROUND" above, Direct Evidence of disparate treatment and retaliation based on age, religion, and retaliation for protected activity is evident in the following testimonies and actions described.

### 1. Mr. Douglas Yee, Panelist (Deceased) and Direct Evidence

Selection panelist Mr. Douglas Yee blithely admitted that he non-selected Plaintiff based on Plaintiff's prior EEO activity and advised all selecting officials to do the same.  The source for was an increasingly used workplace tool - the internet.  Mr. Yee testified how his internet search revealed that Plaintiff had previously filed an EEO complaint against the Army in Germany. Mr. Yee testified that he suggested to his fellow panel members, and to the selecting official, Mr. Bennett, that Plaintiff "might have another chance of bringing a complaint over something else down the road" [if we select him]. Source: EXHIBIT D, ROI, Page 001749.

While this direct evidence came from Mr. Yee on November 5, 2014 when he spoke with his fellow panelists, his deliberate retaliatory discrimination needed to be covered up and the entire recruitment was then destined to be abandoned. On November 7,

2014, Mr. Moffat prepared what is referred to as the "Age Letter".  The letter explained

that Plaintiff was not selected because of his age and perceived proximity to retirement.

This recommendation letter was emailed to Mr. Bennett, the selecting official on

November 7, 2014. it stated in its last sentence:

> *While we felt he had the correct level of contracting knowledge it*
> *appeared that his underlying desire was to return to the Milwaukee area*
> *to retire from Federal government employment, which is not the type of*
> *hire we wanted to recommend for this long-term fill position." Exhibit F,*
> *Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.*

The full text of the "Age Letter" appears at EXHIBIT U "Age Letter", Redacted. Mr. Foss

is deceased.

This "Age Letter", however was never revealed until it was accidently proffered by

Defendant in discovery in 2021.   When Plaintiff's formal discrimination complaint was

being investigated in July 2015, Defendant decided that this basis was facially

discriminatory for age and therefore another cover-up was necessary to hide "Age

Letter" to provide a more legitimate reason and therefore edited the "Age Letter" to

become the "Performance Letter" by deleting the last sentence that discussed age and

replace the sentence with

> *While we felt he had the correct level of contracting knowledge it was*
>
> *overshadowed by the overall performance history."* Exhibit F Deposition Page 36,
>
> Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-
>
> P2P000018115 and at Exhibit D ROI 001730 to 001731.

The full text of the "Age Letter" appears at EXHIBIT V, "Performance Letter", also The full text is in Deposition Exhibit C P2P000018114-P2P000018115 and at Exhibit D ROI 001730 to 001731. Redacted. Mr. Foss is deceased.

The first reference to the "performance letter" appeared during Defendant's investigation in July 2015 when the investigator asked Mr. Moffatt the following questions

> *Q: Who did the panel ultimately recommend for selection, if anyone?*
> *R: I would have to refer to my memorandum.*
> *\*\*\*Please provide any notes, documents, resumes, etc. to the Investigator.\*\*\**
> *Q: If not discussed above, why did you and/or the panel not recommend Mr. Laber?*
> > R: I don't recall.
> > Q: Where did Mr. Laber rank among candidates? LABER-00007618
> > *He was unable to answer. She highlighted the incomplete answers and sent his draft declaration to him for review and completion.  On July 7, he answered*
> > *Although she asked for documents, according to the record, there is no evidence that he sent her any documents.  Despite this, he was able to quote as though he then had access to the letter whereas a few days before, he did not.*
>
> > *Q: Who did the panel ultimately recommend for selection, if anyone?*
> > *R: Upon reviewing my "'Hiring Recommendation" for selection·· selected Cornelius Stevenson as our first selection because his interview went really well showing us his ability to work in a team environment. His level 1 is one course away from being awarded and his MBA showed he had the ability to learn higher tasks.*
>
> > *Q: If not discussed above, why did you and/or the panel not recommend Mr. Laber?*

*R: Upon reviewing my "Hiring Recommendation" provided to Mr. Bennett.  The summary is in the last sentence of his paragraph entry - While we felt he had the correct level of contracting knowledge it was overshadowed by the overall performance history. Page 5 of 7 ROI 001721. Signed Jul 09, 2015 ROI 001722*

It is very convenient to point to the deceased as a source for all information. Mr. Moffatt even claimed that Mr. Yee was also the source for the "Performance history". In his Deposition, however Mr. Moffat didn't and could know where the "performance history", and for that reason only, he was almost "100 percent sure".

> *Q. And again, where did that overall performance history come from?*
> *A. I believe that came from Doug Yee's input.*
> *Q. Are you positive about that?*
> *A. I don't know where else we would have got that information. He had firsthand knowledge of your prior work in the office, so I'm almost 100 percent sure that that performance history was from Doug Yee. Source: Exhibit F, Deposition, Page 35, Lines 12 to 20.*

Mr. Yee's most pertinent testimony below is preceded by an explanation of how and why his declaration supports Plaintiff's claim of direct evidence and pretext evidence if and when a pretext claim is evaluated.

Mr. Yee could not have gained any first-hand knowledge of Plaintiff's performance in July 1985 because their paths only crossed for about a month 29 years earlier.  Indeed, the fact that Defendant caused this exact basis to appear in the panel's official report as the sole reason that Plaintiff was rejected is absurd for this and other reasons discuss herein.

> *Q: When, if ever, did you meet EXHIBIT D, ROI, Page 001747.*
> *R: When I came to Milwaukee in July 1985. he worked in Milwaukee and we overlapped by about 4-5 weeks. He left Milwaukee just after I arrived. 1 got along with him and got to know him briefly then. Source: EXHIBIT D, ROI, Page 001747.*

*The following establishes Plaintiff's age and that Yee appeared to be concerned enough to calculate it.*

> *Q: How old is Mr. Laber (or how old does he seem to be if you are not sure)? Does he seem to be over age 40?*

*R: I believe he is about 66 years old. I remember him and know he's older than I am. After this selection process. I figured out he was about 66, Source: EXHIBIT D, ROI, Page 001747.*

The following establishes Plaintiff's religion and Mr. Yee's knowledge of the religion.

*Q: What do you know or assume Mr. Laber's religion to be?*
*R: When I met him in 1985. he appeared to be a conservative, Orthodox Jewish. Source: EXHIBIT D, ROI, Page 001747.*

The following establishes Plaintiff's observance of his religion.

*Q: How and when did you learn of Mr. Laber's religion, gender, and age?*
*R: I learned of his age after the interview was over. I think I saw his age in his resume. Though I'm not certain. I observed his gender when I met him in 1985. When I met him. we did not discuss his Jewish faith much. but he wears a black suit and wears the formal dress of Orthodox Jewish Americans. Source: EXHIBIT D, ROI, Page 001747.*

The following establishes Mr. Yee's detailed knowledge of Plaintiff's protected activity. as EEO complaint for not receiving a religious accommodation.

*Mr. Laber's claim is based on retaliation for participating in prior EEO protected activity, or opposing discrimination in such a way that your employer was/is aware of the opposition.  Prior EEO activity is defined as:*
*(i) participating in the EEO process as an employee, representative, complainant, management official, or as a non-involved witness;*
*(ii)" opposing" employment discrimination in any manner; or*
*(iii) requesting an accommodation based upon a disability or one's religion.*
*Q: Based on the definition above, what type of prior EEO activity, if any, have you participated in before today (whether or not related to Mr, Laber? ROI 00148*
*R: None*
*Q: Based/ on the definition above, what kind(s) of prior EEO activities has Mr. Laber*
*participated in? ROI 001748*
*R: He was denied a religious accommodation by the Army in Germany. Source: EXHIBIT D, ROI, Page 001748.*

The following establishes a nexus for Mr. Yee's actions.

*Q. How did you learn of this prior EEO activity/ies? ROI 001748*
*R. After the interview, I ran a Google search for Stan laber and I found a news article about Mr. Laber. It indicated that after he left DCMA, he applied for other positions.  I think he tried to get a job with the Army in a town in Germany.  He rented an apartment in a town in German and his diet is restricted due to his*

*religion. Apparently, in his apartment, there was a used microwave oven.  He approached his employer in Germany at the Army base and explained why he needed to have a new, never used microwave oven. The Department of Army, from my understanding delayed responding to Stan for several weeks, so he went to a local retailer and bought a microwave with his own funds.  The Army never responded to his accommodation request, so he filed a complaint.  I'm not sure if it was through EEO channels, but the Army denied him funds to get a new microwave oven.  After reading this article, I thought that was strange that he made a decision to use his own funds without getting a final decision from the Army.  I think he waited several weeks and then decided to put himself at risk by buying the microwave himself, Source: EXHIBIT D, ROI, Page 001748.*

*I wrote a few notes in the #16 panel interview notes papers about this case.*

I heard in 1987, Stan Laber left Milwaukee and went to DCASMA Chicago.  He was there only 2 years and moved on.  I googled the name Stan Laber.  I found a case in 1990 where he got a job as a PCO at a US Army base in Germany.  He lived in an off base apartment in Germany and he had a dirty microwave.  He asked his supervisor if the Army would pay the costs of a new microwave.  Stan is of Orthodox Jewish descent and his beliefs are that food has to cooked safely and in certain custom ways.  His supervisor did not answer his request for 8 weeks.  Stan went out to the local German appliance store and bought a microwave with his own funds.  Stan went back to his supervisor and his request for reimbursement funds was denied.  Stan initiated a complaint with EEO and another agency in the US Army.  Months later the US Army rejected Stan's complaint and reimbursement request.  After reading this story, I wrote a few notes in the #16 panel interviewer notes papers about this case.  I imagine EEO reviewed those notes.  Did Stan's complaint in 2015 used Perceived Reprisal?

*See EXHIBIT P*

The following establishes a causation and nexus for Plaintiff's rejection, a belief that expresses a perceived need for a religious accommodation and animus as to the intensity of Plaintiff's religious observances as being incompatible with government employment.  This also demonstrates retaliation and disparate treatment and disparate impact for prior protected activity and age. It also expresses an intolerance of religious observance and the burden of accommodation, and retaliation for having exercised his protected status to lodge a complaint and law suit and additionally merely being religiously observant in dress and behavior.

*Q. What effect did your knowledge of Mr. Laber's EEO activity have on your decision not to select Mr. Laber? ROI 001748*
    *R. It seemed that he might be a high-risk candidate. In the selection process, we look at all candidates. It was a hard selection because we had about 16~ 18*

*candidates to interview. Mr. Laber was not in our top three choices. I don't recall the names of the top 3. In my vote, I felt the top 3 I nominated were the best qualified in their resumes and gave the best answers to the question in the interviews. Later on, when we finished the interviews, I told the others that based on what I had read online, I thought that perhaps if Stan had a case against the Department of the Army over what he felt was unfair treatment over his procurement of a microwave oven and he did not get resolution to his request for reimbursement, it might have been very important to him, but I felt he might have another chance of a bringing a complaint over something else down the road, Source: EXHIBIT D, ROI, Page 001749.*

This establishes that Mr. Yee. personally informed Mr. Bennett with the results of his

internet search and EEO activity to persuade Bennett not to hire Plaintiff:

"Q. Have your discussed Mr. Plaintiff's EEO activity with anyone (aside from Legal/EEO)? If so, who?" *EXHIBIT D, ROI, Page 001748.*
R: I discussed it with Mr. Bennett and my fellow panel members, I told them it appeared he has [sic] history of litigation with the Army." EXHIBIT D, ROI, Page 001748.

The following establishes how Mr. Yee rationalized his discriminatory retaliation as

merely a legitimate evaluation factor of "high risk", albeit clear direct evidence of

discrimination.

*Q. Why did you not recommend Mr. Laber?*
*R. In our discussion of Mr. Laber, I had commented on him being "high risk" which was based on my reading the article about his actions against the Army base in Germany.  EXHIBIT D, ROI, Page 001750.*

*Q. Was Mr. Laber's prior EEO activity a factor in your decision? If yes, explain fully.*
*R. Yes, I made a statement to my other panel members that he was high risk based on what I learned.  It is possible that when I said, it may have influenced our decision, Source: EXHIBIT D, ROI, Page 001751,*

*Q. Do you have any reason to believe it was a factor in any other panel members/or selecting official's decision in this non-selection? Explain your response?*
*R.  Yes, see above, Source: EXHIBIT D, ROI, Page 001755.1*

Mr. Yee's declaration discussed above is not "stray remarks" but incontrovertible direct evidence of discrimination by a selecting official written within eight months of Plaintiff's rejection (Dated July 7, 2015) and against himself. ROI 001752.

The most glaring evidence related to the two letters:

1. The "Age Letter" is attached to an email from Mr. Moffat to Mr. Bennett in native format dated November 07, 2014. Source: Exhibit F, Deposition, at Exhibit B within it labeled USA-USA-00109283. The age Letter appears in discover only once and was shared beyond Mr. Moffatt and Mr. Bennett.  No read receipts exist in the record. The agency 30(b)(6) apparently had no knowledge.  Mr. Moffat was surprised that it was revealed at his deposition and began disclaim everything about.

Mr. Moffatt was asked about age being a factor via this Q&A:

> Q. Well, if Mr. Yee or Ms. Hanson believed that Mr. Foss or I should not be hired because we were older, do you think you would recall that?
> *A. I probably would be able to recall something like that, because it would stick out in my head that we were talking about something that was not part of our selection criteria. Neither one of your ages were a factor in hiring you or not, and anything beyond that, it would be speculation because I vividly do not remember a conversation like that ever happening, period. Source: EXHIBIT F, Deposition, Page 58 Line 24 to page 59 Line 9.*

The Performance Letter appears in the ROI but has no basis in discovery.  It was never email or faxed and there is no evidence of how or when or by whom it ended up in the ROI. The Performance Letter was false because the Plaintiff's performance was never discussed or proffered as a basis by Defendant ever. Most failure to hire cases focus on qualifications, this case has so no discussion on qualifications at all.

2. Declaration of Mr. Mark Bennet Selecting Official

Mr. Bennet had prior knowledge of Plaintiff's prior EEO activity and coordinated the

cover-up by his false testimony.  His perfunctory denials of the events and his

participation in the cover of Mr. Yee's actions are simply false testimony. His declaration

is evasive and wholly inconsistent with the facts and what occurred.  Each Question is

followed by an explanation of how Mr. Bennett actively acquiesced to agency's leaders

and attorneys to achieve the cover-up for the second certificate.

*Q: How old is Mr. Laber (or how old does lie seem to be if you are not sure)? Does ... he*

*seem to be over age 40?*

> *R: I have no idea. EXHIBIT D, ROI Page 001710.*

> *Q: What do you know or assume Mr. Laber's religion to be?*
> *R: I have no idea. EXHIBIT D, ROI Page 001710.*

> A chief characteristic of a cover-up is denying all knowledge that might be

> ascribed to him [Mr. Bennett] no matter how simple.  Mr. Bennet claims the

> impossibility: that he knew nothing about Plaintiff even though he admits to have

> seen his application." I reviewed the resumes with the panel members in person

> including Mr. Laber's". EXHIBIT B, ROI PAGE 001712.

> *Q: The record indicates that two certificates were provided to you – one dated*
> *October 31,2014 and the other December 11, 2014. Why were two certificates*
> *issued?*
> *R: I requested the second list because I could not find a suitable candidate from*
> *the first list. When I received the second list, HR (AST) said they had to clear the*
> *PPP (Priority Placement), so it took them some time to get it to me. By that time,*
> *no one was interested in the position so we cancelled the action and started over*
> *from scratch.*

There was at least one suitable candidate, the Plaintiff.  Without explanation of why

Plaintiff was not suitable, the above demonstrates the implementation of the cover-up

which begins with don't select anyone and make it appear that you truly need and want

to fill the vacancy by ordering another list when that was not Mr. Bennett's true intent,

Mr. Bennett was asked:

> *Q: Describe the selection process. Were there any rating sheets used to rank candidates for this position?*
> *R: We received the first list and had an EEO-approved panel. I reviewed the resumes with the Panel members in person including Mr. Laber's. The panel took it from there and decided who to interview from the list. I believe they interviewed five candidates including Mr. Laber. Alter the interviews, the panel decided that they could not make a recommendation because the candidate quality was not very high. So they came back to me and I reviewed the candidates and concurred that a decision could not be made given those candidates, so I went back to AST (Minerva Coffey) and requested a second list. In the second list, we actually got more-qualified candidates who were not lying on their applications and straight-lining" them.  However, when we began to call candidates on the second list for an interview, no one was interested because so much time had passed, Source: EXHIBIT D ROI 001712.*

The above continues the lie. He claims he did not select who would receive an interview

but Mr. Moffatt swore very clearly that Mr. Bennett decided on who would be

interviewed and explained exactly why Mr. Bennett made the decision. Mr. Moffatt

stated

> Q: Were you directed or persuaded to recommend a particular candidate or to not recommend a candidate? If so, please explain your response.
> R: It was Mr. Bennett's call to say which ones we should interview.  He's the supervisor and team lead and it was his decision to make. ROI 001722.
> It also denies that the panel made a decision supporting the need to proceed with the sham consideration of more candidates. It reports that no one was interested but such was not the truth.  There is no evidence in the record that anyone was interviewed and the codes entered on the returned certificate indicating lack of interest are simply false.  In order to more quickly execute the sham, Mr. Bennett, contrary to Defendants merit promotion program, the panel was required to interview all applicants on the second certificate. See EXHIBIT M, Merit Promotion Program at 9.2.1. The role of the panel will be to collectively assess the candidates on the competitive referral list and recommend a maximum of five competitive candidates to the selecting official for final consideration. The panel may elect to interview
> *candidates on the competitive referral list, at its discretion. (ND) However, **if any**

*candidate on the competitive referral is interviewed, then all competitive candidates must be interviewed. At his/her discretion, the selecting official may participate as an observer during panel interviews.*

Contrary to his claimed intentions and the Merit Promotion Plan, the panel selected only five candidates on the second certificate and interviewed none of them. His testimony that "no one was interested", was of his own doing.

> *Q: "One point of clarification: Mr. Yee stated he informed you of Mr. Laber having been involved in litigation with the Army in Germany.  Do you have any recollection of his informing you of this? If so, what do you recall him telling you and what effect, if any, did it have on your decision not to select Mr. Laber? Exhibit D ROI 001714.*
> *R: "No, I don't recall any information of litigation in Germany. This had no effect on any decisions I made in the hiring process." Exhibit D ROI 001714.*

Most significant is that each answer is replied to by a lawyer who recreated the question and in every case provided a truthful answer. The problem was that the original question was never answered at all.

The above demonstrates his awareness of Plaintiff's prior EEO activity by the twisted and caveated answer based on the investigator's question. The question is specific but his answer is a non-answer that was written by agency as a cover-up. He merely answered the smallest portion of the compound question: "litigation in Germany" and adds the word "information".  He then answers his own version of the question truthfully with an absurd answer that is meaningless -  he "doesn't recall any "information of litigation in Germany" which has nothing doing to with the question of whether or not he recalls speaking with Mr. Yee.  The answer was obviously written by a DCMA attorney to whom he previously had admitted the truth.  The truth being, that Mr. Yee had indeed, as Mr. Yee wrote in his declaration, advised Mr. Bennett to not hire Plaintiff.

Mr. Bennett was provided many opportunities to reveal his knowledge of Plaintiff's prior EEO activity or Mr. Yee's revelations of Plaintiff's prior EEO activity or his entreaties to not select Plaintiff.  The Mr. Bennett denied it at every turn. The following same misdirection occurs where he only admits that he is not "aware of "the kinds" of Plaintiff's EEO activities, again a truthful lawyer prepared answer.

> *Q: Mr. Laber's claim is based on retaliation for participating in prior EEO protected activity or opposing discrimination in such a way that your employer was/is aware of the opposition.*
> *Prior EEO activity is defined as*
> *(i) participating in the EEO process as an employee, representative, complainant, management official or as a non-involved witness;*
> *(ii) "opposing" employment discrimination in an manner; or,*
> *(iii) requesting all accommodation based upon a disability or one's religion".*
> *Q: Based on the definition above, what kind(s) of prior EEO activities has Mr. Laber participated in?*
> *R: I'm not aware of any. ROI 001715*

The above answer does the same where he only admits that he is not "aware of "the kinds" of Laber's EEO activities, a truthful lawyer prepared answer.

> Q: When (date) did you learn of Mr. Laber's EEO activities?
> R: I believe I learned of the complaint from EEO about 3 months ago. ROI 001711
> Again, the word "activities" is changed to "compliant" and receives a truthful answer.
> Note how the SO's answer restated this question as only concerning itself with the "complaint" and doesn't answer when or if he ever learned of Laber's prior EEO activity from Yee, Lt Moffatt, Major Hanson, or anyone else.

> Q: Have you discussed Laber's EEO activities with anyone else (aside from Legal/ EEO)? If so, who?
> R: No.  ROI 001711

To further distance himself, Mr. Bennett simply refused to answer even the most basic question about his knowledge of Plaintiff, his application, or his prior EEO activity.

Q: Mr. Laber alleges his age, gender, religion, and prior EEO activity were factors in the decision to not select him for the position at issue. What is your response?

R: No. I did not know his characteristics. EXHIBIT D, ROI, Page 001713.

The above answer first changes the question by adding the word "characteristics" and then denies knowing characteristics. Still another truthful answer unrelated to the question.

Mr. Bennet denies even receiving any recommendation letter and only asserts that I believe they interviewed five candidates including Mr. Laber. After the interviews, the panel decided that they could not make a recommendation because the candidate quality was not very high. Source: EXHIBIT D, Page 001712.

He further testified that the selection panel was charged with deciding whom to interview; that the panel recommended no candidate; so he (the SO) requested a second referral list. Source: EXHIBIT D, Page 001712.

He claimed had no one on the second list was interested in interviewing for the position.

He eventually canceled the recruitment. This entire testimony, however, is inconsistent or not supported by the record. Mr. Bennett testified that after he reviewed the resumes, "the panel took it from there and decided who [sic] to interview. I believe they interviewed five candidates, including Mr. Laber." Source: EXHIBIT D, Page 001712.

This testimony above contradicts the testimony of Mr. Moffatt, the panel lead, who testified that Mr. Bennett himself "chose candidates for interview." Source: EXHIBIT F, Deposition, Page 36, Line 2.

> Q: Were you directed or persuaded to recommend a particular candidate or to not recommend a candidate? If so, please explain your response. Deposition Page 35, Line 21.
> R: It was Mr. Bennett's call to say which ones we should interview. He's the supervisor and team lead and it was his decision to make. It was Mr. Bennett's call to say which ones we should interview. He's the supervisor and team lead. Deposition Page 36, Line 2.

Mr. Bennett further testified that "the panel decided that they could not make a recommendation because the candidate quality was not very high. So they came back to me and I reviewed the candidates and concurred that a decision could not be made

given those candidates, so I went back to AST and requested a second list." **Source: EXHIBIT D, Page 001712.**  This statement is contradicted by the testimony of the panel lead and the hiring recommendation document that the lead panel member authored on behalf of the panel on November 7, 2014.  **Source: EXHIBIT D, Page 001712** and ROI Page 001731.

      The panel not only formally recommended a selection but recommended an additional two back up selections in case of declinations. The same document stated Plaintiff was allegedly "not selected" because of his "overall performance history" and it was "questionable whether or not he could work within a team environment in a government setting; also found within the Milwaukee office." EXHIBIT D, ROI 001731. Contrary to his own testimony that he "concurred" with the panel" (EXHIBIT D, ROI 00172), Mr. Bennett rejected the panel's recommendations and requested additional names based on a lower cutoff score.  Plaintiff maintains that Defendant did this solely to build a planned defense to the anticipated EEO complaint.  By canceling the recruitment, Plaintiff could not have suffered any harm because no one was sufficiently qualified.  There is no other plausible explanation given that 26 candidates had been whittled down to 5-6 interviewees and 3 recommended selections without a selection. The personelist, Minerva Coffey testified that the Mt. Bennett wanted to "add additional names" to the list but there is no record of who they were or why or when they were requested or if any of them were referred, interviewed, or were contacted at all, Source: EXHIBIT D, ROI, 001756.  Ironically, the personelist further testified that because Plaintiff was on the original referral certificate, he could still have been selected

at any time until the entire recruitment was canceled on January 13, 2015. Source: EXHIBIT D, ROI 001756.  Mr. Bennett said he "concurred that a decision could not be made given those candidates" but that was not the true decision of the panelists because the panel indeed made its selections. Mr. Bennett's basis for not selecting Plaintiff is not just unclear, it didn't exist at all. He concurred with the panel by rejecting it without saying anything understandable or specific about Plaintiff for rebuttal.  The Mr. Bennett was never pressed or asked to provide any basis whatsoever in regard to the Plaintiff.

The Mr. Bennett admitted that he looked at the documents from the panel but when asked if there were any scoring sheets, he refused to answer the question in ensure they would not be revealed. See EXHIBIT D, ROI, Page 00172 where he was asked if there any "scorings sheets.  No answer appears.

### 3. Declaration of Ms. Hanson Panelist

The third panel member, Ms. Hanson, proffered her false testimony in support of the cover-up by Mr. Bennett's coordination and the agency attorneys who advised Mr. Bennett to quickly close out the first certificate and create the sham effort with the second certificate. Her direct evidence of discriminatory retaliation was her false declaration that Plaintiff's interview was poor, a fact that the EEOC used as its sole basis to protect Defendant from liability.

Hanson's testimony regarding Plaintiff's interview was:
*"My impression was that he was very anecdotal and constantly told "war stories" about past contracting experience and was reliving that but was not giving us answers as concisely as he could have. I got the impression that he had had prior experiences and he wanted to tell us about specific experiences rather than telling us the answer. On paper, his resume shows he has a lot of experience, but when it came to his interview,*

*I was not as impressed. The resume gets you in the door, but the interview determines whether or not you knock it out of the park or not. It seemed like a lot of talk and the walk wasn't really there." EXHIBIT D, ROI, Page 1737.*

*The above testimony is contradicted by Hanson's contemporaneous notes of the interview which contained no mention of "war stories". Hanson reported Plaintiff's interview performance as quoted in her preserved notes while Plaintiff was interviewed. "Overall Assessment: Candidate [Plaintiff] has a lot of USG Contracting Experience. Candidate possesses good business accumen [sic] and confidence for a Contract Administrator position. Particularly impressed with responses regarding leverage [sic] the team for the common goal, problem resolution and workload prioritization. Candidate is motivated by Location unclear why he would leave a GS-13 position though"*
*Hanson reported Plaintiff's answers:*

*"1) Why do you want this position? A: Enjoys contracting and interested in moving to the Milwaukee area.*
*What do you know about Defense Contract Management Agency (Defendant) and what do you perceive the responsibilities of a Defendant Contract Administrator to be? A: Has worked for Defendant throughout his career; familiar with the roles and responsibilities. Aware that it is post award administration (has a lot of experience), cost and price work, business systems. Sees the role as having a workload of large cost type contracts.*
*Describe the most important skill you have developed from your prior work experience that you believe would be a key to being successful in such a position? A: Sees the role as having a workload of large cost type contracts. The key is keeping your eye on what needs to be done; constantly prioritizing; actively manage workload in order to accomplish things and be effective with customers/& respect from the buying offices and contractors; also cooperation in order to provide mutual support; lots of ideas about doing things.*
*Have you had any experience with computer based systems, such as MOCAS, EDW, EDA, or any Defendant eTools? A: Has experience with MOCAS; WAWF; and some eTools. Has a variety of electronic tools experience; can rapidly learn and adjust to new systems. Yes, used about 10-15 different systems to include performance reporting systems, used software for cost estimating, PD2, PRISM, COMPASS, etc. Used a lot of products as procurement analyst in Chicago & at DLA HQ.*
*This position requires knowledge of Federal and Dept. of Defense Acquisition Regulations (known as the FAR & DFARS) associated with both firm fixed price contracts and flexibly priced contracts. Please describe the areas of FAR and DFARS you*

*are most familiar with, and how you may have used them in previous work experiences?*

*Familiar with all parts of the FAR ; used every chapter; capitalized or optimized use Received HCA award Innovative use to award MATOC (for DoD and CIA)= one solicitation--- set new standard for his current organization. Lots of cost experience.*

*Describe your ability to work independently and as a team player. A: Doesn't see much difference; he leads from where he is at (whether or not he has actual authority). Important to leverage the team for the mutual goal. Always contributes and leads when appropriate.*

*Tell us about a situation or problem where you were faced with a deadline to meet without all the information needed to resolve it. How did you*

*handle it and what was the result? A: Happens quite frequently as a contracting officer; often called to meetings that are haphazardly put together--- find out the agenda has changed. Does the best he can with limited data; make sure he understands the question; determines what data he needs. Takes good notes, names, details and make sure the audience understands that you will give tentative answers when you can but you will coordinate for resolve. Generally viewed as a person who can summarize the issue, find resolution and deliver.*

*Always a win-win when he gets involved.*

*Do you have any questions or any additional information you wish to share? A: Not specifically; appreciated opportunity to interview." EXHIBIT G (MS. HANSON DECLARATION) PAGE 119 to Page 124.*

*Indeed Ms. Hanson's comments in her declaration about war stories originating from Plaintiff actually occurred in her interview notes for a different candidate, Mr. Foss. She admitted the same under testimony after reviewing her notes. Additionally, it was a benign event, that when Mr. Foss told war stories he was only providing examples of his experience:*

> *Q Did you see anything in your notes that he wanted to tell war stories or that he did tell war stories?*
> *A Yes. In question number 3 I wrote lots of contracting, quote, war stories, unquote.*
> *Q Was that an indication to you that he didn't really answer the questions directly?*
> *A No, sir. He was providing lots of examples of his experience. EXHIBIT G (MS. HANSON DECLARATION) PAGE 036, Lines 24-25 and PAGE 37 Lines 1-7.*

Ms. Hanson's notes for Plaintiff do not contain the words "war" or "stories" at all. The same words appear twice for Mr. Foss.

4. Deposition of Mr. Moffatt Lead Panelist

Unbelievably, Defendant admits Mr. Yee's actions took place, but claims it played no role in Defendant's rejection. Source: EXHIBIT T, PTO, Page 30.

Indeed, for the first time in the PTO, Defendant claims that even if the panel had recommended Plaintiff, which, it didn't, Plaintiff would still have been rejected. Plaintiff has yet to learn of how this could be and therefore cannot address the defense at this time. Source: EXHIBIT T, PTO, Page 30.

Plaintiff argues in his opposition to the PTO that he was misled and the defense is untimely. Plaintiff is skeptical because Defendant's reaction to Mr. Yee's admission has been a remarkable cover-up that constitutes additional direct evidence.  Central to the cover-up is the undisputed fact that the record contains two false recommendation letters alleged based on the panel's proceedings. In accordance with the request by Mr. Bennett, the recommendations report the panel's evaluation of each of the five candidates interviewed.

Both letters are nearly identical, having the same date (November 07, 2014), the same author (Mr. Moffatt), and the same addressee (Mr. Bennet). For the first 4 candidates, the letters are again identical. For the fifth candidate (Plaintiff), however, the final sentences are inconsistent. The recommendations letters are discussed herein as the "performance letter" and the "age letter".  These titles are derived from the last sentence on last page of each letter where defendant states its alleged legitimate nondiscriminatory basis.

The "performance letter" states in its last sentence:

*"While we felt he had the correct level of contracting knowledge, it was overshadowed by the overall performance history."* Exhibit F Deposition Page 36, Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-P2P000018115 and at Exhibit D ROI 001730 to 001731.

The "age letter" states in its last sentence:

> *While we felt he had the correct level of contracting knowledge it appeared that his underlying desire was to return to the Milwaukee area to retire from Federal government employment, which is not the type of hire we wanted to recommend for this long-term fill position."* Exhibit F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.

Both are false and therefore represent direct evidence of discrimination independently

of their inconsistent, discriminatory, or false content. Each claims to be the true letter.

The "Performance Letter"

The complete text regarding Plaintiff is:

> *"Stan Laber (Not Selected): Mr. Laber interviewed very well but we felt he was not in the top three interviewed.  Mr. Laber currently works at National Geospatial-Intelligence Agency in Sprinfield, [sic] VA. as a Contract Specialist. He has been with DCMA in previous years as an IS [Industrial Specialist] as one panel member remembers his employment at the agency with his performance to be questionable. He currently has a DAWAI [sic] Level III certification and possesses knowledge of Government contracting, although it is also questionable as to his ability to work within a team environment in a government setting: also found in the Milwaukee office. While we felt he had the correct level of contracting knowledge it was overshadowed by the overall performance history."*
> Exhibit F Deposition Page 36, Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-P2P000018115 and at Exhibit D ROI 001730 to 001731.

The first reference to the "performance letter" appeared during Defendant's investigation in July 2015 when the investigator asked Mr. Moffatt the following questions

*Q: Who did the panel ultimately recommend for selection, if anyone?*
*R: I would have to refer to my memorandum.*
****Please provide any notes, documents, resumes, etc. to the Investigator.****
*Q: If not discussed above, why did you and/or the panel not recommend Mr. Laber?*

R: I don't recall.
Q: Where did Mr. Laber rank among candidates? LABER-00007618

*He was unable to answer. She highlighted the incomplete answers and sent his draft declaration to him for review and completion. On July 7, he answered*

*Although she asked for documents, according to the record, there is no evidence that he sent her any documents. Despite this, he was able to quote as though he then had access to the letter whereas a few days before, he did not.*

*Q: Who did the panel ultimately recommend for selection, if anyone?*
*R: Upon reviewing my "'Hiring Recommendation" for selection·· selected Cornelius Stevenson as our first selection because his interview went really well showing us his ability to work in a team environment. His level 1 is one course away from being awarded and his MBA showed he had the ability to learn higher tasks.*

*Q: If not discussed above, why did you and/or the panel not recommend Mr. Laber?*
*R: Upon reviewing my "Hiring Recommendation" provided to Mr. Bennett. The summary is in the last sentence of his paragraph entry - While we felt he had the correct level of contracting knowledge it was overshadowed by the overall performance history. Page 5 of 7 ROI 001721. Signed Jul 09, 2015 ROI 001722*

Ms. Horton followed up the next day:

*Thank you for sending your testimony so quickly. I noticed that on the bottom of page 4, you mention the hair on the back of your neck went up during Mr. Laber's interview- were you able to find your notes from the interview to remind you what caused that? If you have the notes, please also forward a copy to me for inclusion in the investigative file.*

*Also, at the bottom of page 5, you say Mr. Laber was not recommended because of his "overall performance history." What history, specifically, are you referring to?*

> Thank you,
> Melissa Horton  001732

Mr. Moffatt replied on Aug 03, 2015,

> Sorry for the delay in responding I was away on leave with the family
> and returned today.
> I've read your questions -
>
> Page 4 regarding my comment on the hair on my neck, I don't have
> notes to that affect as it was just a feeling that due to his pitch and tone
> of his response that his answers were concerning, but not wrong as to
> there [sic] content.
>
> Page 5 regarding his "overall performance history" that was contributed
> to the statement from one of his previous coworkers Doug Yee while
> working with Mr. Laber in our office. The resume appeared to be solid
> regarding the performance which made me concerned that there might
> have been other issues not presented regarding his performance.
>
> I hope this helps and please feel free to email me regarding additional
> concerns, thank you and again I apologize for the delay in responding.
> V/r, LT Moffatt

The above discussion indicates that the "performance letter" was a sham because it

was not and could not have been the letter that was prepared on November 07, 2014.

Indeed, Defendant has disclaimed everything in it. The "performance letter" remained

in the ROI for the past seven years throughout the administrative period was and never

challenged until Defendant disclaimed it completely as a defense in its interrogatory

answers.  First it dropped "overall performance history" and any mention of

performance as a basis for its rejection.  It also reversed itself in regard to Plaintiff's

interview and his knowledge by claiming the opposite of the panel recommendation

("interviewed very well" and "had correct level of contracting knowledge".

*13. In regard to the above titled charge in Plaintiff's amended complaint, identify all material facts supporting your legitimate non-discriminatory reason(s) for not selecting Plaintiff.*

*ANSWER: Plaintiff did not perform as well during his interview as other candidates and did not demonstrate knowledge in as many areas as the other candidates that were recommended ahead of Plaintiff. All three Panel Members determined that Plaintiff did not perform as well during his interview as other candidates prior to Mr. Yee allegedly googling Plaintiff's name and discovering prior protected activity and prior to any alleged comments made by Mr. Yee to the other Panel Members. Source: Exhibit R, Paragraphs 13 and 14.*

This reversal wasn't just a minor inconsistency because Defendant knew the "performance letter" was false in the first place.  Defendant created it in July 2015 as a substitute for the "age letter" authored November 07, 2014, discussed below.  Even though it exists in the ROI, that is the only place it exists.  It is not substantiated by any evidence; it has no source; it has no electronic date; it has no native version, no evidence exists that it was never emailed to anyone, there is no record of anyone uploading it to the database that underpins the ROI.  Mr. Moffatt, the alleged author, now has no memory of authoring it but swore to its authencity in his declaration in Jul 2015 when its unknown author shared it with him. Obviously, his testimony was false.  Even in his deposition, when he, the agency, and the agency's legal representatives knew that it was false, Mr. Moffatt stood by his earlier declaration.  Mr. Bennett denies that he ever received it and discovery provided no read receipt of either recommendation letter.  Even Defendant's own 30(b)(6) representative, Ms. Butera, quoted the letter as though authentic.

Because the content and its existence are direct evidence of retaliation, meaning it would not have been created except to cover-up the true reason – Mr. Yee's retaliation

for Plaintiff's prior EEO activity.  Mr. Yee's declaration contained no other basis.

Additionally, Defendant cannot rely on it as its legitimate non-discriminatory reason for

rejection, not only because it has disclaimed its content, but Defendant falsely created

it.  Even if any decision maker found the letter somehow to be truthful, the same

decision maker could not find the letter or any substitute for the letter, such as

Defendant's interrogatory answers or the other letter, as legitimate because every one

fails to to articulate such a reason properly "is the legal equivalent of . . . having

produced no reason at all." Patrick v. Ridge, 394 F.3d 311, 320 (5th Cir. 2004). A

central purpose of the second prong is to "focus the issues" and provide the applicant

"with 'a full and fair opportunity' to attack the" explanation as pretextual, quoting

Burdine, 450 U.S. at 256. the evidence must present a "clear and reasonably specific

explanation." accord Burdine, 450 U.S. at 258. A "plaintiff cannot be expected to

disprove a defendant's reasons unless they have been articulated with some specificity."

Loeb, 600 F.2d at 1011 n.5, cited in Burdine, 450 U.S. at 258. 1 MERRICK T. ROSSEIN,

EMPLOYMENT DISCRIMINATION LAW AND LITIGATION § 2:8 (2018); accord Reeves,

530 U.S. at 142; St. Mary's Honor Ctr., 509 U.S. 502, 509 (1993); Burdine, 450 U.S. at

254.  Plaintiff had, and still has no opportunity to rebut any basis for his rejection.


The "Age Letter"

The full text of the portion relating to Plaintiff is:

> "Stan Laber (Not Selected): Mr. Laber interviewed very well but we felt he was
> not in the top three interviewed.  Mr. Laber currently works at National
> Geospatial-Intelligence Agency in Sprinfield, [sic] VA. as a Contract Specialist.
> He has been with DCMA in previous years as an IS as one panel member

*remembers his employment at the agency with his performance to be questionable. He currently has a DAWAI [sic] Level III certification and possesses knowledge of Government contracting, although it is also questionable as to his ability to work within a team environment in a government setting: also found in the Milwaukee office. While we felt he had the correct level of contracting knowledge it appeared that his underlying desire was to return to the Milwaukee area to retire from Federal government employment, which is not the type of hire we wanted to recommend for this long-term fill position." Exhibit F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.*

This letter is authentic and only provided accidently by Defendant in both Bates format and Native format. It was prepared on November 07, 2014 and was attached to email dated November 07, 2014, Source: EXHIBIT F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282. It provides a wholly different basis – age. The letter discusses Defendant's perceived proximity to retirement. There was no business reason other than "it wasn't what we wanted to recommend."

Here again, Mr. Moffatt denies any memory of creating it and Mr. Bennet denies receiving any recommendation letter and only asserts that I believe they interviewed five candidates including Mr. Laber. After the interviews, the panel decided that they could not make a recommendation because the candidate quality was not very high. Source: EXHIBIT D, Page 001712.

Relative to the direct evidence of a cover-up, Defendant wished to erase it from existence and have the "Performance Letter" remain.  This was because it not only cast doubt on the "Performance Letter", but it is facially discriminatory itself. It would not serve well as a legitimate non-discriminatory reason, unlike the "Performance Letter" created to replace it.

Obviously it was part and parcel of the cover-up begun in 2015 that continued into discovery for past three years.  Every trace of this email was eliminated, deleted, or held back in discovery.  That it was produced at all was accidental.  Some reviewer at DCMA or DOJ mistakenly believed it be the "Performance Letter".  Just as hard as it is to keep false accounting records, it is equally difficult to cover-up emails.  This is especially so here, where two letter are nearly identical except for the last sentence.

This portion of the cover-up was first and caused the secondary cover-up to create the replacement "Performance Letter".  Mr. Moffatt was truly surprised seeing this at his deposition and could not explain its existence.  This was especially evident when minutes before he testified that age, or any form of age, was never factor that was considered at any time. See facts.

This portion of the cover-up, although a pre-cursor to that discussed in the "Performance Letter, it is even more troubling because it more directly implicates misconduct in discovery.   More likely than not the agency has not provided all of the documents or screened out for production all that it found showing culpability.

Hanson testimony

As detestable a behavior as it was in the first certificate, the direct evidence did not end there.  The direct evidence continued into the second certificate rising to a level of disgust because it unnecessarily impaired the agency's mission.

Mr. Bennet participated in yet another discriminatory act constituting direct evidence of discrimination.  In order to avoid liability, the agency decided it would be best to cancel the recruitment.  This would prevent Plaintiff from claiming that he was

better qualified than a selectee, who didn't exist.  Alternatively, with no selection, the

entire recruitment might demonstrate since here was no harm no foul could occur, and

hence no liability.

Rather than reveal the plan, Defendant launched yet another ill-conceived and

poorly executed plan to cover-up Mr. Yee's declaration and limit agency liability. Mr.

Bennet was directed to make it appear that Defendant wanted to fill the vacancy. Mr.

Bennett, described it succinctly in his declaration by falsely swearing that he made a

concerted effort that just failed naturally when no one was interested. He executed it

flawlessly except not all of incriminating documentation was eliminated and withheld.

His errors were his undoing. The steps and evidence of completion of each step of this

direct evidence of retaliation sham follow:

Mr. Bennett Non-selected everyone, not just Plaintiff.  This obscures the discrimination

by making it appear to be a simple business decision – consider more candidates.

Mr. Bennett claimed that the candidates on the first certificate were "lying and straight

lining", Source: EXHIBIT D, ROI, Page 001712.

Mr. Bennett claim that he could not find a suitable candidate on the on the first, Source:

EXHIBIT *D ROI, Page 001711.*

Mr. Bennett illogically explained how, candidates who rated lower were better qualified,

Source: EXHIBIT *D ROI, Page 001711.*

Mr. Bennett ignored the Merit Promotion regulations that do not allow release of a

second certificate without a good business reason, Source: EXHIBIT M, Merit Promotion

Program, Paragraph 8.2. states (ND) When a promotion certificate contains at least

three qualified competitive candidates the selecting official may not reject the certificate as inadequate solely on the basis that it contains an insufficient number of eligibles. The reason for rejecting the certificate must be based on merit principles and provided to the AST for recordkeeping purposes if the certificate is rejected. Mr. Bennett simple lied:

"After review, I have determined that there a[sic] no qualified candidates that would be able to complete [sic] the required Journeyman level duties here in the Milwaukee CA position. I request that the list be expanded to include names down to the 85% level. Source: Email 11-14-2014 USA-00027638 EXHIBIT XX"

Mr. Bennett requested the second certificate which included candidates who rated lower but illogically, were claimed by Mr. Bennett as better qualified.

Mr. Bennett eliminated the remaining applicants by making believe he considered them when he had no intention of selecting anyone. He entered false codes.  The codes permitted, See certificate of eligible codes which were not documented as instructed on the required form. Source: EXHIBIT N, SF 39 codes.

Under no circumstances was Mr. Bennett to deviate the plan by selecting anyone.

Mr. Bennett even changed the specialized experience in the original recruitment to ensure the person matched byPPP (Priority Place Plan) candidate would be cleared because of the heighten requirement.  See Exhibit This was a strange act if you are desperately looking to hire but quite logical is just want to hire no one to ensure no agency liability.

Those contacted were improperly persuaded not to interview once they indicated an interest such as Ms. Woodhouse. After she was scheduled in December 2014 for a January 7, 2015, she was called was sent an email on January 5, that she could be not hired above step 1. Based on this she cancelled. Source: EXHIBIT W, Woodhouse Email.

Those contacted were improperly persuaded not to interview once they indicated an interested such as Ms. Woodhouse. After she was scheduled in December 2014 for a January 7, 2015, she was called was sent an email on January 5, that she could be not hired above step 1. Based on this she cancelled. Source: EXHIBIT W, Woodhouse Email.

8.  AST did not send out any notices of non-selection to applicants on the second to ensure no follow-up by applicants.

Delete RPA Tracker All events related to each recruitment are tracked and shared in an online system called "RPA Tracker" at the web address described at the bottom of the page, Source: EXHIBIT E, Page 02191in the ROI.

> Q: Describe the selection process. Were there any rating sheets used to rank candidates for this position? [underlined for emphasis]
> R: We received the first list and had an EEO-approved panel. I reviewed the resumes with the Panel members in person including Mr. Laber's. The panel took it from there and decided who to interview from the list. I believe they interviewed five candidates including Mr. Laber. After the interviews, the panel decided that they could not make a recommendation because the candidate quality was not very high. So they came back to me and I reviewed the candidates and concurred that a decision could not be made given those candidates, so I went back to AST (Minerva Coffey) and requested a second list. In the second list, we actually got more-qualified candidates who were not lying on their applications and straight-lining" them. However, when
> we began to call candidates_ on the second list for an interview, no one was interested because so much time had passed, Source: EXHIBIT D, ROI, Page 001712

An agency Defendant willing to create such an intensive cover-up on one charge is more likely than not to have done the same on all charges.  Plaintiff believes he has yet to discover those cover-ups in other claims. He discovered those described herein only because they were not so amateurishly botched.  It's hard to imagine that Defendant's representatives, as career civil servants at DOJ (Department of Justice), would actively condone or participate in such behavior or defend it to this Court.

The facts, however, are very disturbing and warrant reopening of discovery and even in-camera review of attorney client privileged documents to uncover the depth of the deception perpetrated on the court and Plaintiff.  Finally, appropriate sanctions may be warranted.  Plaintiff has relied on Judge Birzer's experience that guided her rulings that frequently stood by the Defendant's representations to her to the effect that Plaintiff should not expect what Defendant doesn't  have.

Defendant refused to select him and instead created a sham cancellation of the recruitment as still more direct evidence of the cover-up.  Officials failed to provide honest and relevant evidence to the investigator to obstruct the anticipated complaint Plaintiff alleges that Defendant has not and cannot produce any evidence of a legitimate nondiscriminatory reason for rejecting Plaintiff.  Further, because Defendant relies on false and pretextual records and testimony, Plaintiff is entitled to judgment in his favor in regard to liability.  No other factor in the record, untainted or business related, could have prevented Plaintiff from being selected because no business motive existed at all. The fact that no one was selected was immaterial because Plaintiff could have been selected from either referral list or through reassignment, transfer, or reassignment as

each is defined in 5 CFR guidance and other methods approved by Defendant's merit promotion regulation and as stated in JOA. Both certificates remained active. The record contained no legitimate basis for cancellation of the recruitment absent the discriminatory retaliation.

Plaintiff maintains that Defendant discriminated against him on the bases stated above in retaliation for the instant complaint and his previous complaints.

Plaintiff alleges that Defendant has not and cannot produce any evidence of a legitimate nondiscriminatory reason for rejecting Plaintiff.  Further, because Defendant relies on false and pretextual records and testimony, Plaintiff is entitled to judgment in his favor in regard to liability.

5. Deposition of Ms. Butera Agency Representative

Ms. Butera's deposition was useless because she utterly failed to become knowledgeable beyond the facts already stated in the ROI. She admitted that she only spoke with two selecting officials whom she named:

> *Q Did you speak with any selecting officials?*
> *A I spoke with -- my recollection is I spoke with Correen Pounds and Wayne Walls.*
> *Q Did you speak with any selecting officials?*
> *A I spoke with -- my recollection is I spoke with Correen Pounds and Wayne Walls. Source:  Exhibit G, Deposition, Page 10, Lines 23-25.*

She made two admissions regarding Mr. Bennett.  One was that he read the Panel's recommendation.  Because she was shown only "Performance Letter" and not the "Age Letter", it is an admission by Defendant that Plaintiff relies upon in making his case.

Q Just one more confirmation about who nonselected me, did you say it was Mr. Bennett?
A Mr. Bennett was the selecting official. So, therefore, he would be the individual that selects or non-selects.
Q You think he did this in coordination with the panelists?
A I think he took the recommendation from the panel amongst his own review.  Exhibit G, Deposition, Page 93, Lines 16-17.

Seven Years of Silence

From the filing of the informal complaint in 2014 to the present, Defendant nor Mr.
Bennett has never proffered any reason for rejecting Plaintiff.  Any reason that came
close was false, didn't exist at the moment of the decision, was not individualized, was
not clear, not specific, not job related, not believed, pretextual itself, vague, was the
product of an attorney or agency official who did not participate in the action and had no
personal knowledge, not sworn to, was hearsay, discriminatory itself, nonexistent,
contradicted by testimony, contradicted by other reasons, or prohibited by agency
regulation.  Indeed, during its investigation in July 2015, Defendant chose not to even
ask Mr. Bennett why he rejected Plaintiff.  Then on November 30, 2015, Defendant's
FAD (Final Agency Decision), was again silent. It presented "Management's Articulation"
on pages 8 and 9 which reported various facts, but no fact by itself, or as a group of
facts, was proffered as a basis for rejecting Plaintiff.  It stated that the panel "decided
not to recommend anyone" because it was not "satisfied with the quality of any of the
candidates", Source: EXHIBIT J, FAD, Page 8.  Even if true and established Mr.
Bennett's basis to ask for another list of candidates, there still was no clear, specific,
individualized, or legitimate reason ever proffered for Defendant's rejection of Plaintiff
ever.

An employer's nondiscriminatory explanation must be legitimate. The closest
Defendant came to doing so was in the panel's recommendation letters discussed

herein as the "performance" letter and the "age" letter but those letters were false and not prepared by the panel and did not represent the panel's proceedings.

Age Discrimination Claim

A plaintiff may demonstrate age discrimination in violation of the ADEA by providing either direct or circumstantial evidence of discrimination. Roberts v. Int'l Bus. Machs. Corp., 733 F.3d 1306,1309 (10th Cir. 2013). If the plaintiff relies on circumstantial evidence, then we review his claim under the burden-shifting framework first described in McDonnell Douglas v. Green, 411 U.S. 792,93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See id. at 1309. But if the plaintiff produces direct evidence of age discrimination, the McDonnell Douglas framework does not apply. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Direct evidence in this context "is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status." Sanders v. Sw.Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008). In this case, that means direct evidence would be evidence from which a jury could conclude, without inference, that DCMA did not hire Laber because of his age discrimination and discrimination under Title VII.

In regard to a prima facie case of age (equally applicable to Title VII) discrimination in the failure to hire context this court has stated:

The plaintiff must show: (1) he "belongs to a protected class;" (2) he "applied and was qualified for a job for which the employer was seeking applicants"; (3) "despite being

qualified, [he] was rejected"; and (4) "after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotation marks omitted); see McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. The second and fourth elements of this test are intended to eliminate two of the most common nondiscriminatory reasons for the plaintiff's rejection —"an absolute or relative lack of qualifications" and "the absence of a vacancy in the job sought." Kendrick, 220 F.3d at 1226-27 (internal quotation marks omitted). "Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." Id. at 1227 (internal quotation marks omitted).

A plaintiff demonstrates pretext either by showing that a discriminatory reason more likely motivated the defendant's decision or that the employer's proffered explanation is unworthy of belief.    See Marx, 76 F.3d at 327-28.    Evidence sufficient to raise a fact issue on whether a defendant's proffered explanation is pretextual may take a variety of forms, including evidence that the defendant treated the plaintiff differently from others who were similarly situated, which we have held is especially relevant to a showing of pretext.    See E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1195 n. 6, 1198-99 (10th Cir.2000).

Direct Evidence of Age Discrimination

This claim contains multiple instances of direct evidence of discrimination from multiple the panel members. A plaintiff can prove that her employer discriminated

against her by providing either direct or circumstantial evidence of discrimination. Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000). Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons. Ramsey v. City & County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990). Circumstantial evidence allows the jury to draw a reasonable inference that discrimination occurred. Stone, 210 F.3d at 1136.

Mr. Moffatt testified that he relied on Mr. Yee's information.  *See facts xx* Mr. John Moffatt, wrote that Plaintiff was "not selected" because "*it appeared that his [Plaintiff's] underlying desire was to return to the Milwaukee area to retire from Federal government employment, which is not the type of hire we wanted to recommend for this long-term fill position.*"  Exhibit F, Deposition, at Exhibit B within it labeled USA-00109281-USA-00109282.  Later, he swore that the same document's conclusion was that "*while he [Plaintiff] had the correct level of contracting knowledge it was overshadowed by the [his] overall performance history.*"  Exhibit F Deposition Page 36, Line 4 to Line 12. The full text is in Deposition Exhibit C P2P000018114-P2P000018115 and at Exhibit D ROI 001730 to 001731.

Direct Evidence

Under Tenth Circuit precedent, Defendant's tampering and cover-up, together with false testimonies and other acts constitute direct evidence of discrimination and renders any analysis of pretext unnecessary. *See Ramsey v. City & County of Denver,* 907 F.2d 1004, 1008 (10th Cir.1990) (a plaintiff proves discrimination by direct evidence when she presents proof, inter alia, that the employer actually relied on a protected

characteristic in making its employment decision). In short, plaintiff has provided sufficient evidence to create a triable issue as to whether her complaint of discrimination motivated Mr. Kersey's decision regarding a recommendation and, thus, defendant's motion for summary judgment with respect to this claim is denied.  *See McGarry v. Board of County Comm'rs of County of Pitkin,* 175 F.3d 1193, 1200 & n. 4 (10th Cir.1999) (district court erred in granting summary judgment to defendant where plaintiff came forward with direct evidence of discrimination).

McDonnell Douglas burden-shifting analysis doesn't apply in a mixed motive claim. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." Danville v.  Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). Evidence discrimination, if believed, is only direct evidence if it "proves the existence of a fact in issue without inference or presumption." Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007)).  Nor is Plaintiff required to demonstrate a prima facie case.

Even if this Court finds that Defendant has or will offer a legitimate, non-discriminatory reason for its actions against, substantial questions of fact still exist as to whether its proffered reasons were pretextual. This Court has found that Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons. Danville v.

Reg'l Lab Corp., 292 F.3d 1246, 1250 (10th Cir. 2002) (quoting Morgan v. Hilti, Inc.,

108 F.3d 1319, 1323 (10th Cir. 1997)).  For this reason, Plaintiff demonstrates his prima

facie case for both ADEA and Title VII to ensure that his pretext claim is still viable

should his direct evidence fail to warrant a remedy or not meet his "but for"

requirement under some theory required for both liability and remedy such as, but

limited to, back pay.

A clean "direct evidence" case—where direct evidence alone establishes that discrimination was the sole reason for an adverse decision—is rare. Price Waterhouse, 490 U.S. at 271 ("[D]irect evidence of intentional discrimination is hard to come by.") McDonnell Douglas burden-shifting analysis doesn't apply. Trans World Airlines,  Inc. v. Thurston, 469 U.S. 111, 121 (1985). "Direct evidence demonstrates on its face  that the employment decision was reached for discriminatory reasons." Danville v.  Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). Evidence of discrimination,  if believed, is only direct evidence if it "proves the existence of a fact in issue without inference or presumption." Riggs v. AirTran Airways, Inc., 497 F.3d 1108,  1117 (10th Cir. 2007) (quoting Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007)).A plaintiff can prove that her employer discriminated against her by providing either direct or circumstantial evidence of discrimination. Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000). Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons. Ramsey v. City & County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990). Circumstantial evidence allows the jury to draw a reasonable inference that discrimination occurred. Stone, 210 F.3d at 1136.


Prima Facie Case

To establish a prima facie case of retaliation or disparate treatment under Title VII and

ADEA, the plaintiff must show that "(1) she engaged in a protected activity; (2) she was

subjected to adverse employment action subsequent to or contemporaneous with the

protected activity; and (3) a causal connection between the protected activity and the

adverse employment action." Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178

(10th Cir. 1999). Then, assuming the plaintiff satisfies this burden, the burden shifts to

the employer to demonstrate that it had a "legitimate, nondiscriminatory reason for the adverse action." Picture People, 684 F.3d at 988. If the employer can make such a showing, the burden of production "shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." Id

Plaintiff has met the prima facie case requirement because (1) It is undisputed that he engaged in protected activities when he filed prior complaints and sought religious accommodations and was older than 40.  These were facts that became known shortly before or during the recruitment and prior to his rejection. Mr. Yee and the other selecting officials were aware of all of these facts, including that he was older than 40. (2) It is undisputed that he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity because he was not selected, disparately treated and suffered the cover-up.; and (3) It is undisputed that "a causal connection between the protected activity and the adverse employment action" because it is undisputed that he as best qualified, referred, interviewed, and rejected allegedly for the protected reasons stated above based on the undisputed admissions of Mr. Yee and other selecting officials who admittedly relied upon Mr. Yee's information and actively participated in the cover-up by as shown be their testimonies and actions.

   When viewed in the shifting of the burden to Defendant to proffer its legitimates reasons, Defendant has either offered none at all or so vague as to be equivalent to none. The bases were facially discriminatory, inconsistent, retaliatory, not truly believed, false, and after the fact. Because they were so vague, unclear, and

contradictory, Plaintiff was deprived of any opportunity to rebut them.  Plaintiff had no

opportunity to prove that the explanations were a pretext for discriminatory animus

based on his age, sex, religion, and retaliation for filing his informal EEO complaint, his

formal EEO complaint, and his previous complaint with Defendant and other DoD

agencies. Defendant has simply not met its burden of production.

"In the employment discrimination context, 'cat's paw' refers to a situation in

which a biased subordinate, who lacks decision-making power, uses the formal decision

maker as a dupe in a deliberate scheme to trigger a discriminatory employment action."

EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006) (citing

Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)).  In the

instant matter, Mr. Bennett was either the dupe or he duped his subordinates into

prohibited acts of discrimination by controlling them in their direct acts of false acts and

testimonies to facilitate the cover-up.

Theories

Plaintiff has stated a claim for discrimination under the ADEA.


Plaintiff has stated a claim for discrimination under the ADEA by providing both

direct and circumstantial evidence that he was rejected because he was over 40 and

younger applicants were treated more favorably.


The ADEA protects employees age forty and older from, inter alia, failure to hire based

on age.  29 U.S.C. § 623(a).  As with Title VII claims, plaintiffs lacking direct evidence

of age discrimination can prove their claims using the three-step McDonnell Douglas

burden-shifting framework.  See, e.g., Jones v. Okla. City Pub. Schs., 617 F.3d 1273,

1278 (10th Cir. 2010) ("This circuit has long held that plaintiffs may use the McDonnell

Douglas analysis to prove age discrimination under the ADEA."); Schwager v. Sun Oil

Co. of Pa., 591 F.2d 58, 60-61 (10th Cir. 1979) (applying McDonnell Douglas to an age

discharge claim).

To establish a prima facie case of age discrimination in the failure to hire context, the

plaintiff must show: (1) he "belongs to a protected class;" (2) he "applied and was

qualified for a job for which the employer was seeking

applicants"; (3) "despite being qualified, [he] was rejected"; and (4) "after plaintiff's

rejection, the position remained open and the employer continued to seek applicants

from persons of [plaintiff's] qualifications." Kendrick v. Penske Transp. Servs., Inc.,

220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotation marks omitted); see

McDonnell Douglas, 411 U.S. at 802. The second and fourth elements of this test are

intended to eliminate two of the most common nondiscriminatory reasons for the

plaintiff's rejection—"an absolute or relative lack of qualifications" and "the absence of a

vacancy in the job sought." Kendrick, 220 F.3d at 1226-27 (internal quotation marks

omitted).

"Elimination of these reasons for the refusal to hire is sufficient, absent other

explanation, to create an inference that the decision was a discriminatory one."

Id. at 1227 (internal quotation marks omitted). Doing so permits the inference that, unless explained, the action was more likely than not "based on a discriminatory criterion." Furnco Const. Corp. v. Waters, 438 U.S. 567, 576 (1978).

Regardless of the ultimate decision by Mr. Bennett and Plaintiff's other claims under Title VII, the letter established the existence of the taint of age discrimination by the panel or whomever caused the recommendation to be prepared or whomever agreed with it, be it Mr. Bennett or Mr. Harris or any other DCMA official. Mr. Bennett, himself, chose to agree with the panel's decision and continued to seek other applicants.

Both in the first and second certificate, Mr. Moffatt highlighted all applicants who held either a DAWIA or an equivalent FAC certificate. On the first certificate of eligibles, there were 26 candidates which included 3 applicants with DAWIA certifications. They were identified as applicants numbered as 3, 10, and 25 all whom held DAWIA or FAC certificates and received a "green" in the "experience column. Their ages were 70, 61, and 70, respectively but only two of the three were granted interviews. Applicant 3, the oldest female at age 61 was not selected for interview. P2P00001813-14.

In the second certificate of 19 applicants, he similarly highlighted four applicants with DAWIA or FAC certificates and scored then each as the highest at "10" for "experience". He invited them all for interviews except the oldest female at age 64 who was not contacted.

Plaintiff's prima facie case has not and is not disputed by Defendant but it is nevertheless stated now for the record. (1) he "belongs to a protected class" by virtue

of his age as he was over 40 as stated in his Affidavit, Source: EXHIBIT K, Page 1 (2)

he "applied and was qualified for a job for which the employer was seeking applicants"

by virtue of the stipulated fact that he was qualified, referred, and interviewed as

stipulated in the PTO; (3) "despite being qualified, [he] was rejected" as stipulated in

the PTO; and (4) "after plaintiff's rejection, the position remained open and the

employer continued to seek applicants from persons of [plaintiff's] qualifications." By

virtue of the fact that Mr. Bennett asked for second list of candidates he stated in his

declaration.

As set forth in *McDonnell Douglas Corp. v. Green,* 411 U. S. 792, the basic allocation of

burdens and order of presentation of proof in a Title VII case, is as follows. First, the

plaintiff has the burden of proving by the preponderance of the evidence a *prima*

*facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima*

*facie* case, the burden shifts to the defendant "to articulate some legitimate,

nondiscriminatory reason for the employee's rejection." *Id.* at 411 U. S. 802. Third,

should the defendant carry this burden, the plaintiff must then have an opportunity to

prove by a preponderance of the evidence that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination. The

defendant need not persuade the court that it was actually motivated by the proffered

reasons, but it is sufficient if the defendant's evidence raises a genuine issue of fact as

to whether it discriminated against the plaintiff. To accomplish this, the defendant must

clearly set forth, through the introduction of admissible evidence, the reasons for the

plaintiff's rejection.  450 U. S. 252-256.

To establish a prima facie failure-to-hire claim, "[t]he plaintiff must show: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of Plaintiff's qualifications." Burdine, 450 U.S. at 253 n.6

Title VII's anti-retaliation provision (the opposition clause) bars an employer from discriminating against an individual who has "opposed any practice made an unlawful employment practice" by the statute. 42 U.S.C. § 2000e-3(a). To state a prima facie case of Title VII retaliation, Plaintiff must plausibly allege "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." See Khalik, 671 F.3d at 1193 (quotation and citation omitted).


To prevail on a disparate treatment claim under Title VII, a plaintiff must show that his employer intentionally discriminated against him for a reason prohibited by the statute. *See Salguero v. City of Clovis,* 366 F.3d 1168, 1178 (10th Cir. 2004) ("[Title VII] prohibits only intentional discrimination *based upon* an employee's protected class characteristics.") (quoting *EEOC v. Flasher Co.,* 986 F.2d 1312, 1319 (10th Cir. 1992)). If the plaintiff relies upon circumstantial evidence, we apply the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case of discrimination by showing that "(1) he is a member of a protected class; (2) he applied for and was qualified for the particular position; (3) he was not promoted despite his qualifications; and  (4) the position was filled or remained open after he was rejected." *Cross v. The Home Depot,* 390 F.3d 1283, 1286 (10th Cir. 2004); *see also Jones v. Barnhart,* 349 F.3d 1260, 1266 (10th Cir. 2003). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Tex. Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant carries its burden of production, the presumption of discrimination drops out of the case. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination. *Rivera v. City County of Denver,* 365 F.3d 912, 920 (10th Cir. 2004).

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

To prevail on a summary judgment motion on a Title VII retaliation claim, a plaintiff must either directly "show that retaliatory animus played a 'but for' role in the

Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of

retaliation by showing (1) the plaintiff engaged in "opposition to racial discrimination

that is protected under the statute," (2) "a reasonable person would have found the

challenged action materially adverse," and (3) "a causal connection existed between the

protected activity and the adverse action." Id. "Although no magic words are required,

to qualify as protected opposition the employee must convey to the employer his or her

concern that the employer has engaged in a practice made unlawful by [Title VII]."

Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1203 (10th Cir. 2008). A plaintiff's

"[p]rotected opposition can range from filing formal charges to voicing informal

complaints to superiors." Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir.

2004). Appellate Case: 19-3060 Document: 010110302642 Date Filed: 02/11/2020

Page: 16 17

As stated in the PTO (EXHIBIT T), Plaintiff relies on both direct evidence and pretext

theory for all charges and this summary judgment motion. To any extent that his

claims for economic damages (i.e. back pay, front pay, costs, stated herein) might

be limited, he reserves the right to rely on the theory or theories that afford the

greatest economic remedies or he may choose to favor non-economic remedies for

other reasons, or a combination of theories. He reserves the right to choose different,

separate, or both theories for each charge. Each charge may have different or multiple

theories.  The nature of the evidence Plaintiff presents to meet his various burdens is not

intended to be determinative of a specific legal theory or basis for any specific type of

remedy. Should new information arise, he reserves the right modify the above.

The use the phrase "but for" for any charge herein is not meant to limit reliance on

a particular theory or theories, nor does it dictate the highest or lowest bar within each that Plaintiff is required to meet.

For all charges, Plaintiffs theory of liability is one or a combination of the following three scenarios. The first scenario is when the ultimate decision maker manipulated the panel (or certain panelists) to execute his/her own discriminatory and retaliatory motives and intent by advising the panel to reject Plaintiff when the panel (or certain panelists) otherwise would not have done so and did not otherwise hold discriminatory and retaliatory motives or any improper intent. The second is the reverse, where the panel (or certain panelists) held the discriminatory and retaliatory motives and was influenced by the selecting official or ultimate official who otherwise held no discriminatory and retaliatory motives to reject Plaintiff. The third was when the both the panel (or certain panelists) and the selecting official or ultimate official both held discriminatory and retaliatory motives and acted in consort to reject Plaintiff. In this third scenario it was common for either the panel, the selecting official, or both to deny having any discriminatory or retaliatory motive or intent.

DAMAGES

Plaintiff intended to present and argue the propriety of his damages as stated in the PTO, but because it has not been ruled on to date, Plaintiff instead requests that the court delay its PTO decision in favor of the following proposal regarding damages.

In order to reduce the need for protract motion practice, tapping the public fisc for unnecessary expert advice, and necessitating extra jury time regarding damages, Plaintiff respectfully proposes that the parties confer on each category of damages with the intent of agreeing on the following elements if possible.

The name of each, description, source or authority that permits it if known, when and how, and by whom it is normally is calculated (OPM, TSP, DFAS, etc), whether it is subject to a tax bum up, interest (rate and method of compounding, whether it is subject to an offset, whether it requires special approval, whether or not an expert is required for any reason and the type of expertise needed, why an expert is needed, what, if any cap is warranted, and any data points that are needed as input to the calculation the identify the sources.

After conferral, disputes would be conveyed to the court for possible resolution. Failing approval of the above proposal by the court or Defendant, Plaintiff requests his damages, as stated on the PTO of $8,614,976 and calculated as explained in EXHIBIT T, PTO, ECF Page 45 followed by Page 46.

| Charge No. | Back Wages 01/15/2015 to 03/06/2023 | Interest on Back Wages | Tax Neutralization | Other Damages (From Table Below | Total Back Pay | Front Pay | Total Damages (Back pay + Front Pay) |
|---|---|---|---|---|---|---|---|
| Charge 02 | 1,273,634 | 230,440 | 425,472 | 1,964,895 | 3,894,442 | 4,720,534 | 8,614,976 |

| Other Damages for each Charge | |
|---|---|
| Relocation (based on 2 cars) | 500.00 |
| Compensatory Damages | 1.00 |
| Real Estate Expenses Fairfax VA | 23,818.00 |
| Relocation (Fairfax VA to Albany NY April 2914 | 5,166.00 |
| Court and other costs (depositions, expert(s), fees, travel, and supplies estimated | 20,000.00 |
| SF-50 forms for back periods | 0.00 |
| Social Security Benefit reduction per year of (12,588-7,788=4,440) x 8.25 years=39,600) | 39,600.00 |

| | |
|---|---|
| Reimbursement for taxes on mandatory IRA disbursements (Internal Revenue Code, Section 401(a)(9)(C)) due to not being employed. (~20K/y times 8.25 years =165K x tax rate of27%) | 44,550.00 |
| Reimbursement for taxes on mandatory TSP disbursements | 5,000.00 |
| Annuity adjustment for the back pay period to reimburse OPM (95K x 8.25 years | 783,750.00 |
| Annual Leave in Hours (@208 hours/year) for 8.25 years =1,716 hours, if paid value is (~60 x 1716) | 102,960.00 |
| Roth and TSP/401 Contributions and interest earning (no contributions allowed without income *(65K* per year for 8.25 years)=536K for tax avoidance | 107,200.00 |
| Health Savings Act (HSA) benefits that were lost ($100 per year for 8.25 years= | 827.00 |
| Sick Leave in hours(104 hours/year) for 8.25 years= 858 if paid ={~60 x 858 = | 51,480.00 |
| Religious Compensatory Overtime (170 hours *(a),* $60/hour for 8.25 years) | 84,150.00 |
| Increase of high 3 from 136,064 to 174,829 (separate from years of service)= (174839-136064)*0.7 (35.2 years*.02)*18 years (charge 13) or front pay | 488,565.00 |
| Loss in increased annuity from 95K/year for 10 years based 2%/year for 8.25 years =16.5% 95*16.5%*825 | 129,328.00 |
| Loss in Insurable Interest Annuity (1OK/year compounded monthly for 70 years (ii),1.75%) and Spousal annuity (5K per year compound for 5 year **1.75%s**) | 78,000.00 |
| Subtotal | **1,964,895.00** |

Plaintiff is not abandoning his other theories stated in the PTO. Plaintiff still plans on presenting his other theories at trial and in future motions.

Under the McDonnell Douglas framework, an employee who proves her prima facie case is entitled to a presumption that the employer discriminatorily mistreated her. The presumption dissipates only if the employer meets its burden of production.

<u>New Discovery Problems</u>

In preparing this motion, sought to verify the receipt of specific emails only to find that no read receipts exist for Mr. Bennett and Mr. Moffatt.  He also discovered that while all charges include an RPA Tracker document, Charge 02 RPA tracker was never proffered. All events related to each recruitment are tracked and shared in an online system called

"RPA Tracker" at the web address described at the bottom of the page an example is at Exhibit E ROI, Page 02191.

Need for Mediation

Even if the direct evidence herein fails to achieve a remedy, it surely creates material disputes for trial. A trial would be a waste of time and resources for the parties, the court, the jury, and the public. The only possible witnesses are Mr. Moffatt, Ms. Hanson, and possibly Mr. Bennett.

Mr. Moffatt's deposition, provided in full, because it firmly establishes his inability to recall any material event or piece of evidence and that he has no memory of his participation in the panel he led. This lack of knowledge includes the inconsistent recommendation letters he wrote to Bennett. One was facially discriminatory, the other simply false. A jury listening to his repeated testimony of no memory would serve no purpose for the parties, the court, the jury, court, or Mr. Moffatt.

Ms. Hanson could not be found credible by any juror because she denies any knowledge of Mr. Yee's exhortations ever occurring at all. This is in contradiction to Mr. Moffatt's admissions when all three met at the same time. Her interview notes contradict all of her testimonial evidence to date.

Finally, Mr. Bennett not only denies hearing anything from Mr. Yee, he denies any knowledge of the panel's proceedings. He has never provided any reason whatsoever for rejecting plaintiff, nor was he ever asked to provide a reason. Whatever he might say at trial could only be too little too late. This is especially so when he coordinated or cooperated with all of the cover-up action related to sham intent of seeking more candidates when it never happened and only 5 applicants were

contacted.  Plaintiff sought Ms. Kianoury out in 2015, citing Mr. Yee's admissions to work out a settlement. He was ignored.  See Email Laber to Kianoury EXHIBIT O, Email Laber to Kianoury, Bates: Laber-00003946. The DoD investigator, Ms. Horton, offered Ms. Kianoury her mediation services because of the administrative errors she uncovered.  Ms. Kianoury replied "were good" because the errors were merely committed by the agency's personnel office. See EXHIBIT L Kianoury to Horton, Bates: USA-0012166. Finally, Defendant notified Judge James that no mediation would seriously be considered until after summary judgment decisions.

Defendant's intransigence demonstrates its disingenuous attitude. Plaintiff seeks only to be made whole under *Albemarle v. Moody*, not a cent more and not a cent less.

Here, Plaintiff made his prima facie case for the reasons stated above. If every reasonable juror and the court, even after assessing the evidence in the light most favorable to Defendant, would find that the prima facie case "is supported" by the summary judgment record, the Court "must find the existence of the presumed facts of unlawful discrimination and must, therefore," issue summary judgment in Plaintiff's favor. St. Mary's Honor Ctr., 509 U.S. at 510 n.3; accord O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996).

Accordingly, the Court should grant Plaintiffs' Motion for Summary Judgment, enter judgment in his favor, and award damages as claimed in the PTO or as the court finds just.

*Stan Laber*

May 19, 2022
Stan Laber, Plaintiff, Pro Se
321 S. Main Ave
Albany, NY 12209

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above has been submitted to the court clerk for distribution.

Defendant on May 19, 2022.

Respectfully Submitted,

Stan Laber, Plaintiff, Pro Se
321 S. Main Ave
Albany, NY 12209